Gerald P. Burleson, CA Bar No. 145838
Email: strategicmerger@onebox.com
4445 Eastgate Mall, Suite 200
San Diego, CA 92121
Telephone: (858) 794-4805
Fax: (866) 885-6079

ATTORNEY FOR PLAINTIFF,
IP TELESIS, INC.

FILED
CLERK, U.S. DISTRICT COURT

JUL 2 7 2012
10:21

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IP TELESIS, INC., on behalf of itself and all other stockholders of Velocity Networks, Inc.,<br><br>　　　　Plaintiff<br><br>　　vs.<br><br>VELOCITY NETWORKS, INC., KURT WOLFGANG, CHRISTIAN BURKE, RICHARD GROSS, SHERI BERKE, LYLE MAUL and BAKER, BURTON & LUNDY, P.C.,<br><br>　　　　Defendants | No. CV-11-09950-RGK (AJWx)<br><br>FIRST AMENDED COMPLAINT (Fed. R. Civ. P. 23.1)<br><br>(Shareholder Derivative Suit for Breach of Fiduciary Duty and Damages, for Misappropriation of Funds, and for Imposition of Constructive Trust; Minority Shareholder Suit for Breach of Fiduciary Duty by Controlling Shareholders; Shareholder Suit for Removal of Directors) |

Leave of Court having first been obtained, plaintiff alleges by way of this first amended complaint:

### JURISDICTION AND VENUE

1. There is complete diversity of citizenship between the plaintiff and all defendants in this matter and, as will be more fully explained below, the matter in

1

1    controversy exceeds the sum of $75,000, exclusive of interest and costs, so that

2    this court has jurisdiction of this matter pursuant to 28 U.S.C. §1332.

3      2.  Plaintiff IP TELESIS, INC. ("IPT" or "plaintiff") is a corporation duly

4    organized and existing under the laws of the State of Nevada with its principal

5    place of business in Salt Lake City, Utah.

6      3.  Defendant VELOCITY NETWORKS, INC. ("Velocity") is a corporation duly

7    organized and existing under the laws of the State of California with its principal

8    place of business in Los Angeles County, California.

9      4.  Defendants KURT WOLFGANG ("Wolfgang"), RICHARD GROSS

10   ("Gross"), SHERI BERKE and LYLE MAUL are natural persons.  Wolfgang,

11   Gross, Sheri Berke and Lyle Maul are citizens of the State of California and reside

12   in Los Angeles County, California.  Defendant BAKER, BURTON & LUNDY,

13   P.C. is a professional law corporation with its principal place of business in Los

14   Angeles County, California.

15      5.  Defendant CHRISTIAN BURKE ("Burke") is a natural person, a United

16   States citizen and a domiciliary of the State of California.  At all times relevant to

17   the causes of action alleged in this complaint Burke resided in Los Angeles

18   County, California.  Burke recently moved to, and now resides in, Madrid, Spain.

19      6.  The shareholder derivative causes of action alleged in this Complaint are not

20   collusive ones that are brought as derivative actions in order to confer jurisdiction

21   on a court of the United States in a case in which it would not otherwise have

22   jurisdiction.

23      7.  Velocity Networks, Inc., the corporation of which plaintiff is a shareholder and

24   the corporation whose rights plaintiff asserts in the shareholder derivative causes of

25   action alleged in this Complaint, could have sued the same defendants on the

26   claims asserted in this Complaint in this Central District of California, so that

27   venue is proper in this Court under 28 U.S.C. §1401.

28

2

First Amended Complaint

cv-11-9950-RGK (AJx)

8. Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1-10, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences herein alleged and that the damages and injuries to Velocity and its shareholders, including the plaintiff, as herein alleged, were proximately caused by the aforementioned defendants.

9. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned each of the defendants was the agent and employee of each of the remaining defendants and, in doing the things hereinafter alleged, was acting within the course and scope of such agency and employment.

GENERAL ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

10. Velocity was founded in 1999 as an internet service firm providing website design and hosting. The company was formed by the merger of three separate businesses founded and owned, respectively, by the three individual defendants, Wolfgang, Burke and Gross. Velocity has been involved in several different internet-related business segments: (a) telephone service over the internet, also known as voice over internet protocol ("VOIP"); (b) providing broadband internet service; (c) providing private area networks that allow companies to communicate and transfer data between locations; and, (d) colocation, which refers to the providing of secure and controlled environments for customer servers and equipment.

11. Defendant Wolfgang is the Chief Executive Officer and President of Velocity, and he is a director of the corporation.

12. Defendant Burke is a director of Velocity and, although until around early April, 2011, nobody on the Velocity board was aware of it except the individual defendants and Sheri Berke, Wolfgang had characterized Burke as Velocity's

3

1   Chief Technology Officer to some persons outside the corporation.  Burke resigned

2   such purported employment effective as of June 30, 2011 as required by a certain

3   Stock Redemption Agreement signed between said defendant and the corporation.

4   A copy of Burke's Stock Redemption Agreement is annexed to this complaint and

5   identified as Exhibit #1 and is made a part of this complaint for all pertinent

6   purposes.

7   13.  Defendant Gross is a director of Velocity and he was employed as Velocity's

8   Chief Information Officer until July 1, 2011.  Gross resigned such employment

9   effective as of June 30, 2011 as required by a certain Stock Redemption

10  Agreement signed between said defendant and the corporation.  A copy of said

11  Stock Redemption Agreement is annexed to this complaint and identified as

12  Exhibit #2 and is made a part of this complaint for all pertinent purposes.

13  14.  Until its assets were acquired by Velocity, IPT was also involved in

14  providing VOIP as well as other services utilizing internet protocol.  On May 14,

15  2009, under the terms of an Asset Purchase and Sale Agreement between IPT and

16  Velocity and in exchange for substantially all of IPT's business assets, plaintiff

17  acquired 4,152,603 shares of the common stock of Velocity and certain other

18  consideration, although IPT remained as a separate, unrelated corporate entity with

19  valuable investment and income assets.  Under the terms of the transaction IPT

20  was granted the right to designate one director on Velocity's board for a period of

21  five years and the deal also provided that IPT's founder, CEO and President, Greg

22  Nielsen, would be employed by Velocity.  Nielsen was subsequently named by IPT

23  as its designee to the Velocity board, and Velocity appointed Nielsen to lead

24  Velocity's sales team and the formulation of a new agent sales channel and

25  business development.

26  15.  After the merger IPT's shareholdings in Velocity made it the company's

27  second largest stockholder, with at least 17% of the company's outstanding shares.

28  The largest Velocity stockholder after the IPT merger was defendant Burke, who

4

First Amended Complaint

cv-11-9950-RGK (AJx)

then owned 4,908,000 shares, which was slightly more than 20% of Velocity's outstanding shares.  Defendant Gross owned 2,410,000 shares of Velocity, which was 9.8661% of the company's outstanding shares after the merger.  Defendant Wolfgang owned 2,000,000 shares of the company's stock, which was 8.1876% of Velocity's outstanding shares after the merger.

16.  Beginning in late 2010, Wolfgang began looking for a buyer for Velocity. He commenced discussions with Alpha Company[*] concerning a possible sale, and those discussions continued into early 2011.  Eventually, Wolfgang announced to Velocity's board of directors that he had called the deal off because Alpha Company was unwilling to agree to severance payments totaling $510,000 to Burke and Gross.  Until Wolfgang made that announcement some of the directors on Velocity's board, including Nielsen and Roger Donaldson, were not even aware that Burke was considered to be an employee of the company.  Burke had not been seen at the company's premises by anybody for years and there was no reason for anyone on the board to believe that Burke was performing any kind of valuable services for the company that could justify the eye-popping compensation that the Velocity board learned the company had been paying him.

17.  Without informing the Velocity board or seeking its approval, on February 21, 2011 Wolfgang signed a letter of intent ("LOI") to enter into negotiations with Add2Net, Inc. dba Lunar Pages to sell Velocity's data center (the "Data Center"), which is a facility used to house computer systems and associated components such as servers, telecommunications systems and storage systems.  The proposed sale would include all of Velocity's customers of the Data Center and all accounts receivable of the Data Center, among other assets included in the proposed sale of

---

[*] "Alpha Company" is a pseudonym used to protect the identity of the suitor company due to a confidentiality agreement signed by Velocity with the suitor.

First Amended Complaint

cv-11-9950-RGK (AJx)

1  the Data Center.  Under the terms of the proposed deal Velocity would receive

2  $1,175,000 for the Data Center.

3      18.  On March 1, 2011 Nielsen sent an email to Wolfgang stating that he was

4  unaware that the company was close to a sale of the Data Center and he pointedly

5  asked Wolfgang to send him the details of the proposed transaction.  On March 14,

6  2011, after having received no satisfactory response from Wolfgang to his earlier

7  requests for information, Nielsen sent Wolfgang and all other members of the

8  Velocity board an email requesting that Wolfgang call a long overdue

9  shareholders' meeting and Nielsen further requested that Wolfgang schedule a

10  directors meeting for discussion of the proposed sale of the Data Center.  This

11  generated inquiries about the LOI and the Data Center sale from other directors,

12  who also had not been informed of these developments.  There had not been a

13  meeting of the shareholders for election of directors for years and, despite repeated

14  requests by Nielsen since IPT acquired its Velocity shares, there had been only a

15  single board meeting.  Nielsen sought a directors meeting to allow the Velocity

16  board to discuss all issues relating to the proposed sale of the Data Center.  Such

17  issues included, among others, the prudence and adequacy of the transaction,

18  Burke's expressed displeasure concerning Wolfgang's unilateral cancellation of

19  the proposed deal with Alpha Company and his lack of confidence in Wolfgang's

20  handling of any sale of the company, as well as various issues raised by the CEO

21  of Alpha Company, who Nielsen and Burke had contacted after the Alpha

22  Company deal fell apart, including that Velocity's financial numbers presented by

23  Wolfgang kept changing throughout the due diligence conducted by Alpha

24  Company, that Alpha Company had determined that certain tax liabilities of

25  Velocity were instead being carried on Velocity's books as profit centers and that

26  Alpha Company was not willing to pay the severances to Burke and Gross because

27  Alpha Company's due diligence investigation revealed there was no justification

28  for the severances because little or no work was being done for Velocity by those

6

First Amended Complaint

cv-11-9950-RGK (AJx)

1 | individuals.  In response to Nielsen's request for a board meeting Wolfgang

2 | emailed a stern reply to Nielsen that same day to the effect that Wolfgang was in

3 | charge of merger and acquisition activity at the company and that "we will

4 | definitely have a meeting to approve the DC sale."  On March 14, 2011, Christian

5 | Burke sent an email to Wolfgang endorsing and seconding Nielsen's call for a

6 | board meeting to discuss the proposed sale of the Data Center and other matters.

7 | In an apparent attempt to cover his tracks, on March 15, 2011 Wolfgang sent all of

8 | the directors a copy of the LOI for the sale of the Data Center as an attachment to

9 | an email in which Wolfgang stated, "It has come to my attention that I did not

10 | distribute the LOI for the sale of the DC . . . ."  Wolfgang informed Nielsen that he

11 | had scheduled a board meeting for March 29, 2011.  Because Nielsen had learned

12 | that there had been instances in the past when Wolfgang failed to notify board

13 | members of meetings, on March 22 Nielsen sent Wolfgang an email inquiring if all

14 | of the members of the board had confirmed for the upcoming board meeting.

15 | Wolfgang replied, "I think so."  Nielsen checked with some of the other board

16 | members and learned that they had not received any notice of the upcoming

17 | meeting.  Sheri Berke, who is a board member and Velocity's CFO, learned from

18 | Nielsen about the March 29 board meeting and on March 25 she called Wolfgang

19 | to inquire about the upcoming meeting.  Wolfgang became enraged and

20 | immediately telephoned Nielsen and scolded him for calling other members of the

21 | Velocity board on which Nielsen served, said that he could not deal with that kind

22 | of activity by Nielsen and Wolfgang terminated Nielsen's employment because,

23 | according to Wolfgang, Nielsen was "too difficult to work with."  Wolfgang had

24 | fired Nielsen for attempting to carry out his fiduciary duties as a director of

25 | Velocity, which had nothing to do with Nielsen's performance in his job.  Such

26 | action by Wolfgang amounted to a gross abuse of his authority and discretion with

27 | reference to the corporation and it was contrary to the best interests of Velocity for

28 | its CEO to arbitrarily and capriciously terminate an employee such as Nielsen.

First Amended Complaint

19. While Wolfgang was parrying every effort on the part of Nielsen and a few other Velocity directors to learn the details of the proposed sale of the Data Center, Wolfgang was also working out how the sales proceeds would be distributed in a way most beneficial for himself and defendants Burke and Gross. On March 15, 2011 Wolfgang sent an email to Burke and Gross with bullet points outlining how they would be cashed out preferentially in a stock redemption funded in part by proceeds from the sale of the Data Center. But Wolfgang had much bigger plans for how he was going to benefit from the Data Center sale transaction that he was keeping under wraps: his scheme involved using part of the proceeds from the sale of the Data Center to more than double his stockholdings in Velocity and to catapult Wolfgang into position as the corporation's largest shareholder.

20. Meanwhile, the principals of IPT were becoming alarmed at Wolfgang's flagrant disregard of Nielsen's initiatives to learn about the details of the sale of the Data Center and to have an open discussion about the proposed deal by the Velocity board. On March 28, 2011 Nielsen went to Velocity's business office and delivered an electronic drive to Wolfgang's administrative assistant for her to use in downloading a copy of the company's books for Nielsen to review and analyze in preparation for the board meeting scheduled the following day at which discussion of the proposed sale of the Data Center was to occur, among other agenda items. Since Wolfgang was in a closed-door meeting on that occasion, Nielsen sent him an email informing Wolfgang of the electronic drive and that Nielsen wanted an accountant's copy of the books and he requested that Wolfgang, "Please make sure that gets done." In a desperate attempt to avoid Nielsen's gaining access to the company's current financials Wolfgang denied Nielsen's request, allegedly on advice of the company's legal counsel and apparently on the specious notion that since Wolfgang had terminated Nielsen's employment, Nielsen was now in the position of a competitor of Velocity because Nielsen would be seeking another job in the VOIP industry. Through Wolfgang's warped ethical

8

1    lens, that would necessarily mean that Nielsen could no longer be trusted not to

2    disclose the company's financial information to third parties or even to competitors

3    of Velocity.

4       21.  It had now become apparent to Nielsen and the other principals of IPT that

5    the Velocity board was interested in entertaining offers from potential buyers of

6    the company.  They sought to use their broad contacts in the internet service

7    industry to find a potential buyer willing to make an offer for the company that

8    would maximize the value of a sale transaction to all of the shareholders.  As a

9    result of those efforts, a new player, Beta Company* submitted an LOI to buy the

10   company for a price greater than Velocity's current valuation in the marketplace.

11   The Beta Company offer would have paid off all of the company's debt, including

12   loans from insiders, and it would have allowed all shareholders to be cashed out at

13   the same price per share.  The Beta Company offer required the Data Center to be

14   part of the deal.  Nielsen circulated the Beta Company offer to all of the directors

15   at the Velocity board meeting on March 29, 2011.  The Velocity board approved

16   continued negotiations towards a proposed sale of the Data Center at the meeting

17   on March 29, although it deferred a final decision on how to respond to the two

18   different LOI's and on the Burke and Gross stock buy-out agreements for another

19   week.  A telephonic meeting of the board to make those decisions was scheduled

20   for April 6, 2011.

21      22.  As a result of the questions that had been raised about the Data Center deal

22   and other allegations of impropriety and poor business judgment in connection

23   with Wolfgang's fast and loose dealings, other Velocity board members began to

24   insist on having an open discussion about all of those issues at the upcoming board

25   meeting scheduled for April 6, 2011.  Prior to the meeting Nielsen delivered to

26

27   * "Beta Company" is a pseudonym used to protect the identity of the suitor company due to a

28   confidentiality agreement signed by Velocity with the suitor.

First Amended Complaint

cv-11-9950-RGK (AJx)

1  each of the board members an analysis of the impact of the proposed sale of the

2  Data Center on Velocity's long-term financial position and its value to its

3  shareholders.  The analysis had been prepared by Daniel Clark, one of the

4  principals of IPT, who is a C.P.A. with many years of experience in forensic

5  accounting and business valuation.  Clark's detailed analysis raised numerous

6  serious questions about the wisdom of proceeding forward with the sale of the Data

7  Center, including (i) the insufficiency of the price to be paid, (ii) the significant

8  negative impact on, and risk to, the company's value and its financial security

9  resulting from the sale of an asset that had been providing positive cash flow to

10  offset negative cash flows from other company revenue centers when there was no

11  viable plan to replace the Data Center's backfill, and (iii) the transaction appeared

12  to be motivated more by the self interest of Burke and Gross in being cashed out

13  from the proceeds of the transaction than by the business needs of the corporation.

14    23.  All of the seven directors on the Velocity board attended the telephonic

15  meeting on April 6, 2011.  In separate, not-unanimous resolutions discussed

16  hereinafter in more detail, the Velocity board on that occasion (i) approved the

17  buy-back of the stockholdings of Burke and Gross according to a schedule

18  presented by Wolfgang at the meeting, contingent on the execution of the sale of

19  the Data Center, and (ii) approved the sale of the Data Center for a minimum of

20  $1.175 million and further approved and directed the use of the proceeds of that

21  sale as set out in an exhibit presented by Wolfgang at the meeting.  A copy of the

22  exhibits to the board resolutions specifying, respectively, the use of the Data

23  Center sale proceeds and the structure and deal points of the stock buy-back plan

24  are annexed to this complaint as Exhibit #3 and incorporated herein for all

25  pertinent purposes.  Incensed at the flagrant preferential treatment being accorded

26  to Burke and Gross, Nielsen sought to highlight this by making a motion that the

27  corporation offer to redeem the shares of all of the company's stockholders on the

28

First Amended Complaint

1  same terms, but it fell on deaf ears and no board member was even willing to allow

2  discussion of the motion.

3    24.  Burke and Gross abstained from the vote on the resolution by Velocity's

4  board that approved the buy-back of their stock, and Nielsen voted against that

5  resolution.  Since the stock buy-back resolution was, by its own terms, expressly

6  contingent on the "execution" of the sale of the Data Center, the buy-back of the

7  stock of Burke and Gross was clearly linked to the separate Velocity board

8  resolution approving the sale of the Data Center.  As shown by Exhibit #3, Burke,

9  Bross, Wolfgang and Roger Donaldson expected to receive large payments from

10  the Data Center sale proceeds and thus each of them had a material financial

11  interest in the transactions.  Nielsen voted against the resolution authorizing the

12  sale of the Data Center while all of the other directors, including Burke, Gross,

13  Donaldson and Wolfgang, voted in favor of it.

14    25.  In his capacity as CEO of the corporation Wolfgang signed the formal

15  agreement with the buyer for the sale of the Data Center on April 21, 2011 and that

16  transaction was closed and the sale proceeds were disbursed July 1, 2011.

17    26.  The stock redemption agreements between Velocity and, respectively, Burke

18  and Gross, Exhibits #1 and #2, were drafted by the corporation's regular legal

19  counsel, the law firm of Baker, Burton & Lundy, P.C., under the careful tutelage of

20  the individual defendants.  The corporation's legal counsel sought to disclaim their

21  role in facilitating the transaction with a clause in paragraph 12 of each of the

22  redemption agreements that states:

23            The parties acknowledge and agree that Baker, Burton &

24            Lundy, P.C. has drafted this Agreement according to the

25            terms negotiated between the parties, and is not

26            representing either party in its individual capacity with

27            regard to this transaction.  Buyer and Seller have each

28            been advised to obtain independent legal and tax advice

11

First Amended Complaint

1               as to the terms and conditions hereof and its/his rights

2               and obligations hereunder.

3       Paragraph 7 of each of the redemption agreements states, among other things:

4 "The parties agree with and warrant to each other as follows: . . . This Agreement

5 has been approved by the Corporation's Board of Directors."  Such statement was

6 false.  As shown by the second page of Exhibit #3 to this Complaint, which is an

7 exhibit that was attached to the Velocity board's resolution purporting to authorize

8 the stock buy-backs, the board authorized a buy-back of 4,908,000 shares of stock

9 from Burke for a total consideration of $600,000, and a buy-back of 2,410,000

10 shares of stock from Gross for a total consideration of $400,000.  However,

11 between the date of the board resolution authorizing the stock buy-backs, which

12 was April 6, 2011, and the date the Stock Redemption Agreements were signed,

13 which was July 1, 2011, a period of less than three months, Burke's shareholdings

14 in Velocity inexplicably dropped to 3,693,669 shares, a shortage of 1,214,331

15 shares from the buy-back from Burke authorized in the board resolution.  During

16 that same very short time frame Gross's shareholdings in Velocity inexplicably

17 dropped to 1,356,000 shares, a shortage of 1,054,000 shares from the buy-back

18 from Gross authorized in the board resolution.  Gross's shareholdings dropped

19 inexplicably even further between July 1, 2011 and July 25, 2011, to 1,355,783

20 shares, an additional shortage of 217 shares, for a total shortage of 1,054,217

21 shares from the buy-back from Gross authorized in the board resolution.  The

22 number of Velocity shares held by Burke and Gross, collectively, as of July 25,

23 2011 had dropped by 2,268,548 shares.  Coincidentally, as of July 25, 2011

24 Wolfgang's shareholdings in Velocity had increased by 2,268,548 shares over the

25 2,000,000 shares Wolfgang owned at the time of the IPT merger.  Wolfgang had

26 snapped up 2,268,548 of the shares that the Velocity directors had authorized to be

27 bought-back by the corporation from Burke and Gross.  Clearly, these three

28 directors had breached their fiduciary duty to the corporation by conspiring to

12

First Amended Complaint

divert a corporate opportunity to Wolfgang.  Wolfgang had vaulted himself into the position of majority shareholder of the corporation, with shareholdings of 4,268,548 as of July 25, 2011, equivalent to 17.20% of the shares outstanding! Meanwhile, though IPT's shareholdings had remained static since the merger, its percentage of ownership of all Velocity shares outstanding had mysteriously declined from 17.0000% in April, 2010 to 16.73% on July 25, 2011.  This was particularly galling in light of Wolfgang's express, written representations to the Velocity board concerning the Data Center deal and the stock buy-backs from Burke and Gross that were contingent on it: "This buyback represents a 30% increase in all shareholder positions and an annual reduction in expense of $350K." Similar representations were made by Wolfgang in a glowing report to the company's shareholders.

27.  Wolfgang's stock acquisitions from Burke and Gross were enabled and funded by his misappropriation and diversion of the proceeds from the sale of the Data Center.  The board resolution of April 6, 2011 which purportedly authorized the sale of the Data Center also specified the manner in which the proceeds of that sale were to be used.  The verbatim text of the resolution is as follows:

> **RESOLVED** that the Board of Directors of Velocity Networks approves the sale of the Data Center for a minimum of $1.175 million and further approves the use of the proceeds as presented to the Board on April 6, 2011 (See Exhibit A).

The use of proceeds exhibit to the board's April 6, 2011 resolution (the "Use of the Data Center Proceeds Exhibit") is page 1 of Exhibit #3 to this Complaint.  Under the terms of that part of the board's resolution, in summary, the Velocity board stipulated that the proceeds of the sale of the Data Center should be applied to the following uses: $250,000 for an operating cash reserve; $350,000 for "stock buy-back deposit" (the initial payments to Burke and Gross under their stock buy-back

13

1   agreements); $295,000 for specific infrastructure upgrades; and, $200,514 for
2   specific debt pay-downs including, of particular relevance, $50,000 to pay-down a
3   $395,0000 purported debt to Wolfgang carried on the corporation's books.
4   Wolfgang ignored the Velocity board's Use of the Data Center Proceeds Exhibit to
5   the board's authorizing resolution and diverted $344,000 of the Data Center sale
6   proceeds to a preferential payoff of the alleged debt of the corporation to himself.
7   Those diverted funds easily enabled Wolfgang to snap up the additional 2,268,548
8   shares he purchased from Burke and Gross out of the 7,318,000 shares that the
9   April 6, 2011 board resolution anticipated would be bought back by the
10  corporation from those two director shareholders.
11     28.  Although under §1602 of the Corporations Code Nielsen had an absolute
12  right as a director of Velocity to inspect and copy all books, records and documents
13  of every kind of the corporation and although the Velocity bylaws gave all of its
14  directors the same broad rights to access the corporations records, Wolfgang
15  continued to thwart all efforts by Nielsen to obtain access to Velocity's current and
16  historical financial records and to its books, records and documents that would
17  allow Nielsen to fulfill his role and fiduciary duties as a director of the corporation,
18  including his intention to learn the details and specifics (i) of the sale of the Data
19  Center transaction, (ii) of the stock redemption agreements with Burke and Gross,
20  and (iii) of the nature of the services that Burke had performed for the corporation
21  since IPT acquired its Velocity shares that would justify carrying Burke on the
22  corporation's payroll as an employee, among many other questionable issues that
23  Nielsen wanted to investigate.  After several months of being stonewalled by
24  Wolfgang, Nielsen engaged legal counsel and on April 29, 2011 his legal counsel
25  filed a petition for a writ of mandate in the Superior Court of Los Angeles County
26  seeking access to the corporation's records that Wolfgang had been sequestering
27  (case no. 131852, IP Telesis, Inc. and Greg Nielsen, Petitioners v. Velocity
28  Networks, Inc., Respondent.)  Wolfgang remained recalcitrant to the very final

14

hour in regards to turning over the corporate records to Nielsen, relying on flimsy and absurd notions of confidentiality that had no bearing whatsoever in the face of a director's demand for access to the records of the corporation under these facts and that even the corporation's own counsel disclaimed. Nielsen was required to make two separate trips from Texas to Los Angeles to attend hearings and conferences related to that proceeding and it was not until September 9, 2011, under the threat of potential sanctions and being held in contempt by the judge in the superior court case, that Wolfgang relented and provided Nielsen with the password to Velocity's accounting records. After almost six months of baseless stonewalling by Wolfgang, Nielsen finally was able to begin examining the company's records to get the answers about the questionable transactions that he was seeking to learn about, although Wolfgang even now continues to withhold certain information in the corporate records that Nielsen has sought to examine. Throughout the pendency of the mandate proceedings Wolfgang misrepresented the nature of those proceedings to the other directors on Velocity's board, insisting that the case was merely a "mediation" between himself and Nielsen, and Wolfgang misrepresented to the Velocity board his reasons for withholding the documents, asserting that it was on the advice of counsel despite that the company's attorney had acknowledged numerous times to Nielsen's counsel that Nielsen is entitled to all of the corporation's records he has been seeking.

## I. FIRST CAUSE OF ACTION
(Shareholder Derivative Action against nominal defendant Velocity and against defendants Wolfgang, Burke, Gross and Sheri Berke for Damages for Breaches of Fiduciary Duty and the Director's Standard of Care, for Imposition of a Constructive Trust and for Relief from any further Performance under the Stock Redemption Agreements, and against Sheri Berke, Lyle Maul and Baker, Burton & Lundy, P.C. as Aiders, Abettors and Co-Conspirators)

First Amended Complaint

cv-11-9950-RGK (AJx)

29. Plaintiff incorporates in this cause of action the allegations of paragraphs 1-28 of the complaint.

30. Plaintiff brings this cause of action as a shareholder derivative action in the right of Velocity. Plaintiff is now and was a shareholder of record of Velocity at the time of all of the transactions complained of in this shareholder derivative action. Velocity is a nominal defendant on the ground that its consent to bring such cause of action as the plaintiff could not be obtained. The real defendants in this cause of action are Wolfgang, Burke, Gross, Sheri Berke, Lyle Maul and Baker, Burton & Lundy, P.C.

31. Plaintiff fairly and adequately represents the interests of the shareholders similarly situated in enforcing the rights of Velocity Networks, Inc. as alleged in this cause of action in this Complaint. Plaintiff's efforts to have this suit brought for defendant Velocity Networks, Inc. by its board of directors seeking to recover the losses described in this shareholder derivative cause of action in this Complaint are described in paragraph 37 hereof.

32. Plaintiff is challenging the transactions approved by the board at the April 6, 2011 meeting as being void because they were contrary to the corporation's best interests. Since four of the seven Velocity directors who voted favorably on the resolution to sell the Data Center had a financial interest in the outcome of that resolution, with Nielsen's "no" vote there were only two disinterested directors who voted in favor of the sale of that critically important asset. Under these facts, plaintiff contends that under §310 of the Corporations Code, both of the transactions are void, or at least are voidable, unless the defendants sustain the burden of proving that the resolution approving the sale of the Data Center and the related stock redemption resolution was in the best interests of the corporation. Subsequent to the Velocity board's approval of the disputed transactions, defendant Kurt Wolfgang and the company's CFO-director, Sheri Berke, were advised by the company's attorneys and its CPAs that Velocity could not do the

16

stock redemptions because even after the cash infusion from the sale of the Data
Center, the corporation could not satisfy a financial ratio mandated by the
Corporations Code as a condition precedent to a stock redemption.  Instead of
returning to the board of directors and seeking further authorization and
instructions, Wolfgang unilaterally restructured the stock redemption transactions
and the manner in which the proceeds from the sale of the Data Center were
disbursed, increasing the pay down of his own investment debt from the $50,000
payment authorized by the board resolution to a $394,000 debt pay down to
himself.  In turn, Wolfgang used those funds to purchase the first "tranche" of
Velocity shares from defendants Christian Burke and Richard Gross that were
slated to go the corporation under the board's resolution authorizing the
redemption agreements.  Plaintiff contends that in essence these insider defendants
engineered the sell-off of the corporation's only revenue positive asset knowing
that the corporation could never acquire the shares it obligated itself to buy under
the terms of the redemption agreements.  One year later, in April, 2012, this has
proven further to be true as Velocity's obligation to redeem the second tranche of
shares from defendants Christian Burke and Richard Gross has now become due
and the corporation is in a further declined financial condition and is still barred
from redeeming shares, so the insiders now propose to have another insider, Lyle
Maul, purchase that second tranche of shares.  Plaintiff contends that the disputed
transactions have hobbled the corporation financially and that the defendants and
the corporation's CFO, Sheri Berke, are now fraudulently touting the transactions
as forward thinking to justify the improvidence of their actions and to mislead the
company's shareholders and this court.  Further, Wolfgang's misappropriation and
unauthorized diversion of the Data Center sale proceeds in the manner described
above in this complaint constituted a flagrant breach of his fiduciary duty as a
director and officer of the corporation and amounted to an outrageous diversion of
corporate funds contrary to the specific mandate of the Velocity board's resolution

17

and unjust enrichment by Wolfgang with the conspiratorial knowledge, assistance, participation and complicity of Burke, Gross, Sheri Berke, Lyle Maul and Baker, Burton & Lundy, P.C.  Plaintiff contends that the series of transactions involving the sale of the Data Center and the Burke and Gross Stock Redemption Agreements were foisted on the Velocity board of directors by Wolfgang through his manipulation, abuse and flagrant disregard of the corporate governance process, and that Kurt Wolfgang, Christian Burke and Richard Gross breached their fiduciary duties as officers and directors and/or breached the director standard of care set out in Corporations Code §309 which required each of them to perform their duties as a director in good faith, in a manner the director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances (i) in advocating and voting for the underlying board resolution authorizing the sale of the Data Center while their motives and interests in the transaction were compromised and conflicted due to their own self-interest in that transaction and in the linked stock redemptions with the result that the value of the corporation was significantly diminished by the transactions and the corporation was placed at risk of future insolvency, its prospects for a legitimate sale of the company were reduced and its business options and its ability to execute its business plans going forward were compromised; (ii) by Wolfgang, in voting for the resolution authorizing the two stock redemption agreements, and by Burke and Gross in accepting the preferential benefits afforded to them under such agreements and in failing to fully and adequately disclose all information to the other Velocity board members regarding the two transactions;  (iii) by Wolfgang, Burke and Gross in their participation, complicity, failure to object to, and acceptance of the benefits of the usurpation and diversion of the corporate opportunity and the misappropriation and unauthorized diversion of the Data Center sale proceeds to enable Wolfgang to exponentially increase his

18

First Amended Complaint

cv-11-9950-RGK (AJx)

1  shareholdings at the expense of the corporation and the other shareholders; (iv) by

2  Wolfgang in allowing Burke to remain on the corporation's payroll as an

3  "employee" for years after Burke effectively retired from any involvement in the

4  day to day business of the corporation, and by Burke in accepting such benefits

5  without providing any valuable services to the corporation; and, (v) by Wolfgang,

6  in denying Nielsen and the other non-conspiring Velocity directors access to

7  corporate records and to information about all of these questionable transactions

8  that should have caused such board members to reject the transactions if they had

9  the full information; in Wolfgang's flagrant abuse of his authority in firing Nielsen

10  because Nielsen sought to fulfill his fiduciary duties as a director; in Wolfgang's

11  abuse of his authority and discretion with reference to the corporation in

12  manipulating the corporate governance process through his denial of director and

13  shareholder access to records and information, through his refusal to schedule

14  meetings of the shareholders and of the board, and through his conducting of

15  important and significant corporate transactions without consulting with the board

16  or seeking its authorization, effectively resulting in the unilateral corporate

17  governance of Velocity by Wolfgang; and, in Wolfgang's clandestine, preferential

18  insider dealings with Burke and Gross.

19       Defendant Sheri Berke breached her fiduciary duties as an officer and

20  director and she aided, abetted and conspired with the principal defendants,

21  Wolfgang, Burke and Gross, to enable them to carry into fruition their

22  unscrupulous designs, as already described in this complaint, by: (i) Sheri Berke's

23  continue denial of access to, and withholding from, Nielsen and the other outside

24  directors Velocity's current and relevant historical financial statements and other

25  financial records as well as the opinions of the corporation's legal counsel and its

26  outside C.P.A. she had learned about from Wolfgang that the corporation was

27  barred from doing the stock redemptions because of the mandate in Corporation's

28

19

First Amended Complaint

cv-11-9950-RGK (AJx)

Code §500, because the corporation was undercapitalized, although that important

information, had she disclosed it to the non-conspiring directors, should have

informed them and alerted them of the compromised financial condition of the

corporation and of the improvidence and recklessness of the proposed sale of the

Data Center and of the illegality and impossibility of performance by the

corporation of its obligations under the stock redemption agreements because of its

inability to satisfy the 125% assets over liabilities financial ratio mandated by

Corporations Code §500, and despite Sheri Berke, Wolfgang and all other directors

having received on April 21, 2011, and prior to the closings, respectively, of the

sale of the Data Center and the stock redemption agreement transactions, an

explicit, written demand from plaintiff's legal counsel, Daniel Zohar, seeking yet

again all of the corporate financial records Berke and Wolfgang were continuing to

withhold from the board and informing Berke and Wolfgang in very clear terms of

the legal baselessness of their actions in withholding those records.  A copy of such

written demand from plaintiff's legal counsel is annexed to this amended

complaint as Exhibit #9 and is incorporated herein by reference for all pertinent

purposes.; and, (ii) Sheri Berke's preparation and formulation, upon the request of

Wolfgang, of a projection of the corporation's balance sheet in April or May, 2012,

essentially one year in the future, using a software program in which Berke

inputted projected sales revenue assumptions furnished by Wolfgang that Berke

knew quite well were doubtful, unrealistic and inflated merely for the purpose of

obtaining the results from Berke's calculations that he wanted and thus resulting in

a sham projected balance sheet for the corporation that Berke knew would be, and

was in fact, in turn submitted by Wolfgang to other persons, including the

corporation's outside C.P.A., its attorneys and Wolfgang's coterie of "advisors",

including Lyle Maul, and used by all of them in justifying proceeding forward with

20

First Amended Complaint

cv-11-9950-RGK (AJx)

the two disputed and linked transactions and in sham justification for burdening the corporation with the illegal stock redemption agreements.

Defendant Lyle Maul aided, abetted and conspired with the principal defendants, Wolfgang, Burke and Gross, to enable them to carry into fruition their unscrupulous designs, as already described in this complaint, by: (i) Despite Wolfgang's characterization to the Velocity board of Lyle Maul as a "trusted board advisor", and Maul's acceptance of that exalted role by attending Velocity board meetings where Wolfgang referred to Maul as a "board advisor" and by Maul's participating in the board's discussions at the meetings he attended under the mantle of such assumed role, Maul directly participated in discussions the board was not privy to with Wolfgang, the corporation's outside C.P.A. and its attorneys which, although all of the participants knew that the corporation was barred by its financial condition from proceeding with the stock redemptions by the prohibition in Corporations Code §500, Maul and the other participants concocted, endorsed and moved forward a scheme to proceed with the stock redemption agreements under the notion that the corporation could do so if there was a plausible basis to claim that the corporation might be in a suitable financial condition to do the redemptions at a future time, provided that the terms of the redemption agreements were changed from those approved by the Velocity board and further provided that Wolfgang's entire $394,000 investment debt owed to him by the corporation was repaid from the proceeds of the sale of the Data Center contrary to the board's express instructions in its authorizing resolution.  Lyle Maul knew or reasonably should have known that this scheme, assuming arguendo that it could be legitimatized under any scenario, at a minimum required further Velocity board approval and he knew that Wolfgang did not intend to seek such further approval from the board.; and, (ii) Lyle Maul further aided, abetted and conspired with the principal defendants to enable them to carry out their designs when, within a few

21

First Amended Complaint

days following the demand from IPT's chairman, Brian Pettersen, that the Velocity board authorize this lawsuit, and acting with the approval and encouragement of Wolfgang, Maul sought to maintain a lid on the wrongdoing that would be exposed by this lawsuit and to influence IPT's pursuit of the lawsuit by acting as the "straw man" for one or more buyers, which as his email suggests must have included Wolfgang, in communicating a proposal to buy IPT out as a shareholder in Velocity.  Lyle Maul's email to Pettersen, already previously discussed in this complaint, is Exhibit #8 annexed hereto.  Comments made by Linda Gross in a telephone conversation with Nielsen shortly prior to the Velocity board's consideration of that resolution strongly suggest that an unidentified third party made a similar communication and offer to Linda Gross for the same reason.

Defendant Baker, Burton & Lundy, P.C., aided, abetted and conspired with the principal defendants, Wolfgang, Burke and Gross, to enable them to carry into fruition their unscrupulous designs, as already described in this complaint, when one or more of the attorneys at that firm drafted the stock redemption agreements between Velocity and, respectively, Christian Burke (Exhibt #1 to this complaint) and Richard Gross (Exhibit #2 to this complaint), despite the knowledge by every attorney at the firm who was involved in the transactions that: (i) The terms of those stock redemption agreements, as drafted and signed, were contrary to the terms authorized by the Velocity board.; (ii) Velocity was barred by law from doing the stock redemptions because it was undercapitalized at the time the agreements were negotiated and approved by the Velocity board as well as when those terms were "reworked" by Wolfgang without the board's consent, drafted and signed, and there is nothing to support the premise that Corporations Code §500 would allow a corporation to bind itself to a stock redemption agreement, even if the redemption obligations mature in the future, if the corporation is undercapitalized and barred from doing stock redemptions at the

First Amended Complaint

1  time the agreement is signed.  In any event, there was no reasonable basis to expect

2  that the corporation's impairment would not still exist when the corporation's

3  payment obligations under the agreements matured.; (iii) The payments to

4  Wolfgang, Burke and Gross from the proceeds of the sale of the Data Center were

5  in violation of the corporation's covenants to its secured lender under its SBA loan

6  documents and security agreements and would likely cause the corporation to be in

7  default under those agreements and void the SBA's guaranty of those loans to the

8  Bank.; and, (iv) The attorneys knew that this scheme, assuming arguendo that it

9  could be legitimatized under any circumstances, at a minimum required further

10 Velocity board approval, and they knew that Wolfgang did not intend to seek such

11 further approval from the board.  The attorneys at Baker, Burton & Lundy, P.C.

12 involved in drafting the stock redemption agreements did so merely as scriveners,

13 and not as the corporation's legal counsel, as was expressly stated and agreed to in

14 paragraph 12 of each of those redemption agreements.  Therefore, the claim now

15 asserted in this complaint against the law firm as an aider, abettor and conspirator

16 with the principal defendants, and as described in this paragraph, is not a claim for

17 malpractice since the firm stepped out of its role as the corporation's legal counsel

18 when attorneys at that firm drafted the stock redemption agreements. 33.  By

19 virtue of Wolfgang's relationship of trust and confidence placed in him as a

20 director and officer of Velocity and by virtue of his fiduciary duty owing to

21 Velocity, all of which Wolfgang breached when, in each instance, he (i)

22 misappropriated and diverted proceeds from the sale of the Data Center to

23 preferentially pay-off completely the $395,000 alleged debt to Wolfgang carried on

24 the corporation's books; and, (ii) then used those funds to enable himself to

25 purchase the 2,268,548 shares of additional Velocity stock from Burke and Gross

26 out of the 7,318,000 shares that the April 6, 2011 Velocity board resolution

27 anticipated would be bought back by the corporation from those two director

28 shareholders, thereby unjustly enriching himself with misappropriated funds,

First Amended Complaint

1  accordingly, the Plaintiff seeks a declaratory judgment from this court that

2  Wolfgang holds the 2,268,548 shares of Velocity stock he wrongfully acquired, as

3  described above, as a constructive trustee for the corporation, the beneficial owner

4  of those shares, and plaintiff seeks an order of this court directing the constructive

5  trustee to immediately transfer the shares to Velocity.

6    34.  As a proximate result of the acts of the defendants as described above,

7  Velocity has been damaged in the sum of at least $7,000,000, or in an amount as

8  shown by proof at trial of this case, as a result of the improvident, unauthorized

9  and void sale of the Data Center, by the misappropriation and diversion of the

10  proceeds of the sale of the Data Center and from the illegal financial burden of the

11  stock redemption agreements on the corporation.  By this shareholder derivative

12  action, plaintiff seeks to recover Velocity's damages according to proof, provided

13  that appropriate credit shall be given to the defendants, as applicable among them,

14  for the value of the Velocity stock transferred to the corporation by the

15  constructive trustee.

16    35.  The aforementioned conduct of the defendants was done with the intention of

17  depriving Velocity of property or legal rights or otherwise causing injury to

18  Velocity, and was an intentional misrepresentation, deceit or concealment of a

19  material fact known to the defendants with the intention on the part of the

20  defendants of thereby depriving Velocity of property or legal rights or otherwise

21  causing injury so as to justify an award of exemplary and punitive damages.

22    36.  In addition to the other relief sought as described above, plaintiff seeks a

23  declaratory judgment of this court relieving Velocity of any further duty to perform

24  under the Burke and Gross Stock Redemption Agreements, and rescinding the

25  obligation to make further performance under such agreements, because (i) the

26  stock redemption agreements were procured in breach of the fiduciary duties of

27  Wolfgang, Burke and Gross, and in breach of their director standard of care; (ii)

28  the terms of the agreements as written are different from those presented to the

24

First Amended Complaint

cv-11-9950-RGK (AJx)

1  Velocity board and thus the agreements as written were never authorized by the

2  board; (iii) the stock redemption agreements are prohibited by Corporations Code

3  §500 because the corporation was insufficiently capitalized to do a stock

4  redemption at the time the Velocity board purportedly authorized the agreements

5  and there was no reasonable expectation that such impairment would be removed

6  that would justify binding the corporation to the obligations under those

7  agreements, and thus the agreements were a sham; and (iv) for the further reason

8  that such redemption agreements and the representations and omissions of material

9  fact made by Wolfgang, Burke and Gross to obtain them from the Velocity board

10  constituted the offer or sale of securities by means of written or oral

11  communications which included untrue statements of material facts and omissions

12  to state material facts necessary, in order to make the statements made, in light of

13  the circumstances under which they were made, not misleading in violation of

14  §25401of the Corporations Code, entitling Velocity to the remedy of rescission

15  under §25501of the Corporations Code.

16    37.  At all times relevant to this complaint there have been seven persons on the

17  Velocity board of directors, including Kurt Wolfgang, Christian Burke, Richard

18  Gross, Sheri Berke, Linda Gross, Greg Nielsen and Roger Donaldson.

19        The Velocity board's meetings on April 6, 2011 and on October 25, 2011, at

20  which resolutions were adopted that are challenged in this case, were conducted

21  telephonically and such meetings were recorded with the consent of all participants

22  and such recordings are available and will be offered at the trial of this case in

23  support of plaintiff's case.

24        All of the disinterested directors on the Velocity board who voted in favor of

25  the two disputed resolutions adopted on April 6, 2011 did so either (i) without

26  informing themselves of all material information reasonably available to them or

27  that they should have demanded be made available to them in order to make an

28  informed business decision on such resolutions, or (i) they ignored and refused to

First Amended Complaint

cv-11-9950-RGK (AJx)

1   consider the information.  For purposes of both of those linked resolutions adopted

2   on April 6, 2011, including the resolution authorizing the sale of the Data Center

3   and the resolution authorizing the stock redemptions from Christian Burke and

4   Richard Gross, material information for a decision by the directors reasonably

5   should have included, at a minimum, (i) the corporation's current and relevant

6   historical financial statements, which should at least have included the

7   corporation's financial statements for the two years preceding the proposed

8   transactions contemplated by the two linked resolutions; (ii) proforma financial

9   statements projecting the financial impact the proposed transactions reasonably

10  could be expected to have on the corporation over time and as the financial

11  commitments assumed by the corporation in connection with the resolutions

12  became due; (iii) the opinions of competent, independent legal and accounting

13  professionals on the proposed transactions, and particularly on the proposed stock

14  redemptions, in light of the corporation's current financial condition and its

15  projected financial condition over time as shown by the proforma financial

16  statements; and, (iv) the opinion of a competent, independent valuation

17  professional on the value of the data center that would justify the price for which

18  those assets that were critically important to the survival and value of the

19  corporation were proposed to be sold.  As was revealed by the comments of Kurt

20  Wolfgang and Kirk Retz, the corporation's legal counsel, made by them at the

21  Velocity board's subsequent meeting on October 25, 2011, the opinions of legal

22  and outside accounting professionals on the proposed transactions contemplated by

23  the two linked resolutions were not even sought by the board until after the board

24  passed those resolutions on April 6, 2011.  Further, no valuation of the data center

25  justifying the price at which the assets were sold was ever obtained.

26          Clearly, as earlier alleged in this complaint, Kurt Wolfgang, Christian Burke

27  and Richard Gross were conflicted and compromised and personally interested in

28  the resolutions and could not exercise business judgment with respect to both of

First Amended Complaint

those linked resolutions at the April 6, 2011 board meeting.   Greg Nielsen voted
against both of the two resolutions because, as Nielsen discussed at the board
meeting on April 6, 2011, he and the rest of the disinterested directors had not been
provided with the corporation's financial statements and proformas concerning the
proposed transactions.  With respect to the resolution authorizing the redemption
agreements, Nielsen stated at the April 6, 2011 board meeting that he voted against
it for the further reason that he was opposed to the obvious preferential treatment
of the two insiders, Christian Burke and Richard Gross.  Sheri Berke, a director
and a certified public accountant and the corporation's Chief Financial Officer and
its secretary, presumably did have access to all of the corporation's current and
relevant historical financial statements and to the proformas, assuming any had
been prepared at the time of the April 6 board meeting as they should have been,
and therefore as an accounting professional she should have known that the
corporation could not redeem the shares from Christian Burke and Richard Gross,
as was proposed, because even with the injection of cash from the proposed sale of
the Data Center, with all of the financial commitments and liabilities of the
corporation existing and proposed to be assumed under the resolutions and in light
of the elimination of the Data Center from the corporation's balance sheet and the
other financial impacts resulting from the proposed transactions, the corporation
would not be able to satisfy various sections of the Corporations Code that prohibit
stock redemptions unless a corporation can satisfy certain financial ratios
including, without limitation, the mandate of subsection (b)(1) of Corporations
Code §500 which requires, in general, that immediately after a redemption a
corporation's assets be at least equal to 125% of the corporation's total liabilities.
Further, Sheri Berke failed to demand that the opinion of a valuation professional
be sought to confirm the adequacy of the price for which the data center was
proposed to be sold.  Sheri Berke's affirmative votes on the two linked resolutions
at the April 6, 2011 board meeting thus amounted to reckless indifference or even a

First Amended Complaint

1  deliberate disregard of the interests of the stockholders of Velocity, and thus

2  amounted to gross negligence.  The other two directors, including Linda Gross and

3  Roger Donaldson, were not provided with all of the material information that

4  reasonably should have been available to them, including the corporation's current

5  and relevant historical financial statements, the proforma financial statements that

6  should have been prepared and the professional opinions, although both of them

7  had sought the corporation's financial statements prior to the April 6, 2011 board

8  meeting and they were denied access to them by Wolfgang.  Those two directors

9  failed to demand that they be furnished all of the material information that should

10 have been available to them for their review and consideration prior to voting on

11 the proposed resolutions at the April 6, 2011 board meeting.  Such failure

12 amounted to reckless indifference or even a deliberate disregard of the interests of

13 the stockholders of Velocity, and thus amounted to gross negligence.  As reflected

14 by Exhibit #3 to this Complaint, Roger Donaldson expected to receive a $50,000

15 loan pay down from the proceeds of the sale of the Data Center and thus he was

16 not "disinterested" in the resolutions, in any event.  Wolfgang likewise was not

17 disinterested in the resolutions because he also expected to receive a $50,000 loan

18 pay down from the proceeds of the sale of the Data Center.  Even if Wolfgang is

19 considered disinterested for purposes of the director vote on the resolutions, or

20 either of them, on April 6, 2011, he like Sheri Berke presumably at least had access

21 to all of the corporation's current and relevant historical financial statements and to

22 the proformas, if any there were on April 6, 2011, as there should have been, but as

23 reflected by his comments at the subsequent board meeting, Wolfgang did not seek

24 and obtain the opinions of legal and outside accounting professionals on the

25 transactions contemplated by the two linked resolutions until after the April 6,

26 2011 board meeting and he never sought the opinion of a valuation professional to

27 confirm the adequacy of the price for which the data center was proposed to be

28 sold, thus Wolfgang's affirmative vote on those resolutions on April 6, 2011,

28

First Amended Complaint

cv-11-9950-RGK (AJx)

amounted to gross negligence.  As a result of the foregoing, the resolutions adopted by the Velocity board on Aril 6, 2011 are stripped of the protection of the business judgment rule.  Further, since the Data Center was the corporation's only asset that was producing a positive income stream and it was back-filling the losses the corporation was sustaining on its other revenue centers, shareholder approval should have been sought before the corporation sold off what was effectively its most important asset.

Consistent with the requirements of the bylaws of Velocity authorizing the calling of a special meeting by two directors, on September 19, 2011, and with the approval of Roger Donaldson, Greg Nielsen sent an email to Velocity's corporate secretary, Sheri Berke, and to all the other members of the Velocity board, in which Nielsen and Donaldson gave notice of a telephonic special meeting of the Velocity board scheduled for September 22, 2011 at 1:30 p.m. Pacific Standard Time to consider a resolution proposed by Nielsen authorizing the filing by Velocity of the shareholder derivative causes of action that are alleged in this complaint.  A copy of such notice is attached to this complaint as Exhibit #4 and is incorporated herein for all pertinent purposes.  The notice of the September 22, 2011 special meeting attached a copy of a draft complaint containing essentially the same shareholder derivative causes of action as set forth in the Complaint filed in the instant case, except only for minor modifications in the factual allegations in light of certain factual revelations that occurred subsequent to September 19, 2011.  The notice of the September 22, 2011 special meeting also attached copies of the Christian Burke and Richard Gross stock redemption agreements and a copy of the minutes of the Velocity board's April 6, 2011 special meeting, including the exhibits to such minutes.  Those stock redemption agreement and the exhibits to the minutes of the Velocity board's April 6, 2011 special meeting are attached to the Complaint filed in the instant case as exhibits #1, #2 and #3, respectively.

First Amended Complaint

cv-11-9950-RGK (AJx)

1    Wolfgang's intention to use all of the levers and power available to him in
2 his position to squelch this challenge to his authoritarian control of the corporation
3 and its board became quite apparent on the following day when Wolfgang sent
4 Greg Nielsen an email advising him that nobody on the Velocity board had
5 accepted Nielsen's "invitation" to attend the special board meeting.  A copy of
6 such email from Wolfgang is annexed to the Complaint and identified as Exhibit
7 #5 and incorporated by reference herein for all pertinent purposes.  Only Nielsen,
8 Donaldson and Linda Gross appeared for the properly called meeting on
9 September 22, 2011, and the meeting was adjourned for lack of a quorum after the
10 attendees waited fifteen minutes to see if any other directors appeared.  Sheri
11 Burke had sent an email in response to the notice of the meeting stating that she
12 was out of the country and could not attend the meeting.

13    On September 23, 2011, once again with the approval of Donaldson, Greg
14 Nielsen sent an email to the secretary of the corporation and to all the other
15 members of the Velocity board in which Nielsen and Donaldson gave notice of yet
16 another telephonic special meeting of the Velocity board to consider Nielsen's
17 resolution that would authorize the lawsuit against Wolfgang, Burke and Gross.
18 That meeting was scheduled for September 29, 2011 at 5:00 p.m.  On September
19 25, 2011, Sheri Burke sent another email to all of the members of the Velocity
20 board advising that she would not be attending the special meeting on September
21 29 because she was out of town, although the meeting could have been attended by
22 any director telephonically from any place in the world.

23    On September 27, 2011, Brian Pettersen, the Chairman of IP Telesis, Inc.,
24 sent an email to all of the members of the Velocity board demanding that the board
25 authorize the lawsuit that Nielsen had proposed that the corporation bring against
26 Kurt Wolfgang, Christian Burke, Richard Gross and the DOE defendants.  A copy
27 of Pettersen's emailed demand made in behalf of IPT is attached to this complaint
28 as Exhibit #6 and is incorporated herein for all pertinent purposes.  That same

First Amended Complaint

1    afternoon and within hours of Pettersen's demand, Wolfgang responded by sending

2    an email to all of the Velocity board members advising them that, "This,

3    [Pettersen's demand] and all other continued harassment will be documented and

4    dealt with by our legal counsel."

5        A little over an hour before the scheduled board meeting on September 29,

6    2011, Wolfgang sent an email to all of the members of the Velocity board that was

7    obviously calculated to prevent a quorum from appearing for the board meeting

8    that afternoon.  In such email Wolfgang acknowledged for the first time the

9    seriousness of the issues raised by Nielsen in the proposed lawsuit and Wolfgang

10   stated that because two of the Velocity board members are out of the country, the

11   board meeting to consider those issues could not happen until the following week

12   or the week after that, and he announced, "We will send notice of the meeting as

13   soon as a date is selected."  In that same email Wolfgang began making his case

14   for how everything that had been alleged in the lawsuit proposed by Nielsen was

15   somehow perfectly okay.  A copy of Wolfgang's September 29, 2011 email to the

16   Velocity board is attached to this Complaint as Exhibit #7 and incorporated herein

17   for all pertinent purposes.

18       Only Nielsen and Linda Gross appeared for the meeting on September 29

19   and the meeting was adjourned for lack of a quorum after the two directors

20   dutifully waited on the conference call line until 5:15 p.m., as had been done at the

21   September 22 meeting.  Of particular significance, Roger Donaldson telephoned

22   into the meeting conference call line around 5:20 p.m., which was after the

23   meeting had been adjourned and neither Nielsen nor Linda Gross were still on the

24   call line.  Donaldson then telephoned Nielsen and told him that he forgot the

25   meeting was scheduled to start at 5:00 p.m., and Donaldson insisted that he be

26   considered as having attended the board meeting.  Donaldson's late arrival, shortly

27   after the meeting was adjourned, would be a handy lapse for anyone concerned that

28   perhaps a quorum of disinterested directors might just show up for the scheduled

31

First Amended Complaint

meeting in spite of Wolfgang's obvious scheme to abort the meeting. But Nielsen had already begun to suspect that Donaldson was being manipulated and controlled by Wolfgang. Although Donaldson had been willing to assist Nielsen by joining with him in calling the two failed special board meetings to consider Nielsen's resolution to bring the lawsuit, Donaldson had also expressed strong reservations to Nielsen about authorizing the lawsuit because of Donaldson's long-standing friendship and business relationship with Wolfgang and because Donaldson feared that if he endorsed the lawsuit Wolfgang would never allow the corporation to repay some loans that were still owing to Donaldson. Donaldson had also revealed to Nielsen shortly before the scheduled September 29, 2011 board meeting that he was communicating everything Nielsen and Donaldson discussed concerning the proposed lawsuit to Wolfgang.

On September 30, 2011, Brian Pettersen received an email from Lyle Maul, who is a Velocity shareholder and a crony of Wolfgang. Lyle Maul's role as a Velocity board "advisor" was unilaterally assigned to him by Wolfgang shortly after the March 29, 2011 board meeting, with no input from any of the other Velocity board members. In his email to Pettersen, Maul claimed to have assembled a small group of buyers willing to purchase the shares of Velocity held by IPT for a similar price per share to that Velocity was obligated to pay Christian Burke and Richard Gross under the redemption agreements. A copy of Maul's September 30, 2011 email to Pettersen is annexed to this complaint and identified as Exhibit #8 and incorporated herein for all pertinent purposes. Maul's email shows on its face that a copy of it went to Wolfgang and the email appeared to be yet another attempt, inspired probably by Wolfgang, to derail Nielsen's board resolution to bring the lawsuit against the three directors. Neither Pettersen nor anyone else acting in behalf of IPT engaged in any dialogue with Lyle Maul or anyone else in connection with this apparent attempt by Wolfgang to either get rid of the lawsuit Nielsen was proposing by buying out IPT or at least to taint

First Amended Complaint

Pettersen, Nielsen and IPT with the appearance of conflicts and ulterior motives concerning the lawsuit and potentially to invite Nielsen to breach his fiduciary duties as a director of Velocity if he withdrew his resolution proposing the lawsuit.

On October 6, 2011, Wolfgang emailed a notice to all members of the Velocity board of a telephonic meeting scheduled for October 11 to consider the litigation that had been proposed by Nielsen.  Later that same evening Roger Donaldson emailed all board members to advise them that he could not attend the meeting on October 11, without any explanation as to why he could not attend. Then on October 10, 2011, Wolfgang sent another email to the members of the Velocity board cancelling the meeting scheduled on October 11 and stating that the meeting would be rescheduled.

On October 24, 2011 at 2:30 p.m. Wolfgang sent all of the board members a notice that he had scheduled a telephonic special meeting on the following day at 7:30 in the evening, with no agenda specified.  When several board members complained about it Wolfgang sent another email later that same evening specifying the agenda for the next evening's telephonic board meeting, as follows:

> 1) Nielsen Lawsuit (Approve\Reject)
>
> 2) Opportunity!! – LOI received for sale of Velocity (Discuss)

Apparently Wolfgang would have preferred no discussion at all on Nielsen's resolution, just and up or down vote.

Linda Gross had assured Nielsen on numerous occasions that she was solidly behind his proposed resolution to bring the lawsuit against the three director defendants, one of whom is her former spouse, Richard Gross.  Ms. Gross owns 2,505,000 shares of Velocity stock, representing approximately 10.10% of the company's outstanding shares.  On the afternoon of October 25, 2011, Greg Nielsen spoke on the telephone several times with Linda Gross.  In those

First Amended Complaint

conversations Ms. Gross informed Nielsen that on the preceding evening she had received a telephone call from her former spouse, who she had not spoken to for months, and he had explained to her how the lawsuit proposed by Nielsen would significantly devalue the stock she owns in Velocity and would likely disrupt the purchase of the company by the suitor under the recently presented LOI.  Ms. Gross informed Nielsen that, although she still was in favor of the lawsuit, she wanted to wait at least ninety days before she would be willing to approve bringing the lawsuit because she did not want to do anything that might cause a buyer to reduce the amount it offered for the company or to disrupt the sale of the company. Nielsen pointed out to her that if a sale of the company took place as things currently stand Wolfgang would reap a huge windfall at the expense of all of the rest of the shareholders and Nielsen asked Ms. Gross how she would be able to deal with that?  Ms. Gross replied that she would deal with it at that time.  Ms. Gross mentioned in the same conversation that there might be a third-party who could buy her out as well as Nielsen so that the two of them would not need to "interfere" anymore.  Nielsen immediately knew from that comment that it was probable that Wolfgang's crony, Lyle Maul, had also communicated an offer to buy Linda Gross's Velocity shares similar to the offer that Maul had communicated to IPT, and that Ms. Gross's judgment as a director on the lawsuit proposed by Nielsen had been compromised by that proposal as well as by the influence of the call she received on the preceding evening from Richard Gross.

Later that same evening, and shortly prior to the scheduled telephonic board meeting, Nielsen had a disturbing telephone conversation with yet another Velocity director, Roger Donaldson.  Donaldson informed Nielsen that no matter what was said at the upcoming board meeting he intended to abstain from voting on the proposed resolution to bring the lawsuit against the three directors.  In the conversation, Donaldson said that he wanted to inquire about a few things alleged in the complaint including how Wolfgang's stock ownership went up so much and

34

1  about the salary paid to Christian Burke, but Donaldson declared that he did not

2  know why or how a company could sue its own board members and Donaldson

3  said that he had been told by Wolfgang that he does not want the allegations in the

4  proposed complaint "tried" at the board meeting.

5        The Velocity board meeting on October 25, 2011 was attended

6  telephonically by all of the seven directors on the company's board.  Other persons

7  attending the meeting were Kirk Retz, an attorney with the Baker, Burton &

8  Lundy, P.C. law firm, the corporation's outside legal counsel, and Lyle Maul.

9  During the board meeting that evening and prior to the vote by the directors on the

10  lawsuit there was a lengthy discussion about the allegations that had been made in

11  the proposed complaint furnished to each of the directors by Nielsen.  Those

12  discussions were dominated by two persons, Kirk Retz and Wolfgang.  Essentially,

13  with some minor exceptions, most of the allegations in the complaint were

14  admitted by Wolfgang, who also offered various explanations in an attempt to

15  ameliorate the impact of what had occurred or otherwise to exculpate himself,

16  although in some instances Wolfgang offered unsupported denials of things that

17  are mostly minor to the case such as the alleged continuation with Wolfgang's

18  approval of an exorbitant salary paid by the corporation to Christian Burke for

19  years, without the board's knowledge, after Burke had retired from the company

20  and was no longer performing any valuable services, although Burke was on the

21  special meeting conference call and he could have explained what services he had

22  been performing that justified the salary but he did not do so.  Of particular

23  importance, Wolfgang admitted the following during the meeting: (i) all of the

24  $395,000 loan from Wolfgang that was carried on the books of Velocity was paid-

25  off from the proceeds of the sale of the data center, although the April 6, 2011

26  board resolution only authorized a $50,000 pay down on that debt; (ii) it was Kent

27  Burton, an attorney with Retz's firm, who had brought the 125% asset to debt ratio

28  requirement to Wolfgang's attention and for about a month following the April 6,

35

First Amended Complaint

1 | 2011 board meeting Wolfgang had back and forth discussions with various

2 | persons, including Lyle Maul, Sheri Berke, Retz, the corporation's outside CPA

3 | and others, trying to figure out how to get the board resolution completed, and the

4 | consultations with the professionals led to the conclusion that a workaround

5 | existed if the stock purchase was done by an individual instead of the company

6 | because the professionals had advised that an individual does not have to meet the

7 | same test of assets to liabilities that a company is required to meet; (iii) the outside

8 | CPA told Wolfgang that since you have debt on the balance sheet of the company

9 | owing to you [Wolfgang], if instead of paying the $350,000 [that was supposed to

10 | be paid from the data center sale proceeds toward the stock redemption

11 | agreements] to Christian Burke and Richard Gross, you paid it to yourself and then

12 | buy the stock directly from them, you accomplish the same thing with the added

13 | benefit of reducing the corporation's debt by $350,000; (iv) Wolfgang said that the

14 | decision to do the deal this way was ultimately his decision because it was in the

15 | best interest of the company to do it this way or otherwise the transaction with

16 | Christian Burke and Richard Gross could not be done; (v) Wolfgang admitted that

17 | he had scuttled both of the earlier director meetings called by Greg Nielsen to

18 | consider the proposed lawsuit as well as another meeting called by Linda Gross

19 | and Wolfgang offered the explanation that after he was threatened with the lawsuit

20 | he "ran everything through legal counsel" and it was under the advice of legal

21 | counsel that we not discuss these things in a meeting; (vi) Wolfgang admitted that

22 | the price he paid for the Velocity shares he bought from Christian Burke and from

23 | Richard Gross, at $0.14 per share, was significantly cheaper than the price

24 | [pegged] for the shares of Velocity that were exchanged by the corporation for the

25 | assets purchased from IPT, at $0.35 per share.

26 |      Kirk Retz sought to take charge of the board meeting at the outset although

27 | his attempt was promptly stifled by Roger Donaldson who assumed the role of

28 | chair of the meeting. Nevertheless, Retz interjected himself throughout the

First Amended Complaint

1 meeting and was particularly combative whenever Greg Nielsen made any
2 statement Retz disapproved of.  Kirk Retz made the following statements and
3 admissions during the meeting and prior to the vote by the directors: (i) Retz stated
4 that he has no attorney-client privilege with any individual on the Velocity board,
5 and maintained that his client is the corporation; (ii) Retz discussed the 125%
6 requirement in the Corporations Code, explaining that there was inadequate
7 capitalization of Velocity for the corporation to complete the transaction under
8 which it was going to redeem the stock of Christian Burke and Richard Gross; (iii)
9 in response to continued questioning by Greg Nielsen about whether the
10 corporation will be in compliance with the 125% requirement in the Corporations
11 Code when the second, third and fourth rounds of payments come due in future
12 years under the stock redemption agreements with Burke and Gross, Retz insisted
13 that Nielsen was "mixing apples and oranges here" and then went on to use the
14 same justifications for the purchase of the stock by Wolfgang, contrary to the
15 board's April 6, 2011 resolutions, that Wolfgang had offered up earlier in the
16 meeting that same evening: it was, according to Retz, in the financial interest of the
17 company that the stock buybacks be handled this way; (iv) although he had
18 declined responding directly to Nielsen's question about whether the company
19 would eventually be in compliance with the 125% rule when future obligations
20 under the stock redemption agreements come due, Retz did state that based on the
21 analysis and the projections done at that time [when the deal was closed] the
22 company is in compliance and will be in compliance at all times throughout the
23 transaction; (v) Retz confirmed that he did advise Wolfgang not to schedule board
24 meetings called by Greg Nielsen to discuss litigation; (vi) Retz explained the
25 justification for Wolfgang's refusal to turn over corporate records to Nielsen in the
26 lawsuit Nielsen brought to get those records, explaining that there was a "conflict"
27 between Nielsen's status as a former employee of the company, who would have
28 no right to the information about the company Nielsen was seeking, and with

37

First Amended Complaint

cv-11-9950-RGK (AJx)

Nielsen's status as a board member, which gave Nielsen full rights to the
information he was seeking about the company, and Retz implied that various
solutions to the problem were being explored with the principals of IPT, including
a proposal to replace Nielsen on the Velocity board with another person designated
by IPT, but when Nielsen shot back that the proposal Retz was describing had been
made by IPT many months ago, in April, and Retz had done nothing in response to
it as of the time of this board meeting, Retz promptly sought to cut Nielsen off by
saying he [Retz] could talk about it [the negotiations] but he would not advise it in
this context unless that is how the board wants to spend its money, presumably
referring to Retz's attorney's fees while he discusses the issue further at the board
meeting; (vii) in response to a comment by Nielsen that he thinks the stock
purchased by Wolfgang from Christian Burke and Richard Gross belongs to all of
the shareholders, Retz jumped in and pointed out to the board that it would have
been illegal for the corporation to have bought back the stock and that is why "we"
had to move in a different direction, to which Nielsen replied that he was opposed
to the transaction in the first place and that it was the lack of financials and
proformas to the board and Nielsen's objection to the transaction because of that
which resulted in his [Nielsen's] being terminated by Wolfgang, to which Retz
responded that he was aware that Nielsen's demand for the documents preceded
his being terminated by a day or two, then Retz once again sought to cut Nielsen
off by saying the discussion was outside of the scope of the agenda for the board's
meeting.

When Nielsen's resolution that the board authorize the lawsuit against Kurt
Wolfgang, Christian Burke and Richard Gross was brought to a vote, the following
responses were given by the directors:  Kurt Wolfgang, Christian Burke and
Richard Gross "recused" themselves, although all of them had actively engaged
during the meeting in discussion opposing the resolution or denigrating Nielsen
and IPT during the discussion on the resolution;  Roger Donaldson abstained; Greg

First Amended Complaint

1  Nielsen voted in favor of the resolution; and, Linda Gross and Sheri Berke both
2  voted against the resolution.  Kirk Retz advised that the motion had failed because
3  it was not supported by a majority of the four directors who were voting as was
4  required for board action according to the corporation's bylaws.

5        The Velocity board's rejection of Nielsen's resolution to bring the lawsuit
6  against the three directors, Kurt Wolfgang, Christian Burke and Richard Gross,
7  was a wrongful rejection because Kirk Retz was conflicted in his duties and
8  loyalties, and Retz's statements, his misrepresentations, his omissions to state
9  relevant material facts, and his misleading legal opinions expressed during the
10 Velocity board meeting and before the vote by the directors on Nielsen's resolution
11 misled the board and prevented the board from exercising its business judgment on
12 the resolution.  Kirk Retz had reviewed the allegations in the proposed complaint
13 shortly after it was emailed by Greg Nielsen to all of the directors, and Retz had
14 even made comments about the proposed lawsuit to Daniel Zohar, the attorney
15 representing IPT and Nielsen in the lawsuit pending in Superior Court seeking
16 records and financials that Wolfgang was withholding from them.  Retz certainly
17 would have known from the allegations in the complaint that his law firm and
18 some of the attorneys at his firm, including Retz, have potential liability to
19 Velocity for their actions in counseling the breach of a board resolution, and Retz
20 failed to mention anything about that to the board that evening.  Retz's repeated
21 assurances to the board that evening that he did not represent any board member
22 and that he only represented the corporation was disingenuous because he failed to
23 explain to the board how that assertion can be squared with the Christian Burke
24 and Richard Gross stock redemption agreements drafted by Retz's firm, Exhibits A
25 and B to this Complaint, each of which purport to disclaim representation by
26 Retz's law firm of the corporation or of Christian Burke or Richard Gross,
27 respectively, in connection with those redemption agreements, and Retz further
28 failed to explain how a law firm representing the corporation could possibly have

39

First Amended Complaint

1   participated in the engineering of a scheme that was in direct breach of an explicit

2   resolution of the corporation's board of directors concerning the appropriation of

3   funds from the sale of a major corporate asset.  Retz further misled the board in his

4   explanatory comments about the "workaround" that was done with his advice and

5   assistance when Retz failed to mention during his comments (i) that Wolfgang,

6   Burke and Gross had a duty to return to the board and seek further authorization

7   instead of proceeding to ignore and directly violate the board's express instructions

8   contained in its April 6, 2011 resolution authorizing the stock buybacks, and (ii)

9   that Retz, as the corporation's legal counsel, had a duty to counsel the three

10   directors not to proceed without further authorization from the board and that he

11   had a further duty not to assist and counsel in the violation of the board's April 6,

12   2011 resolution.

13        The Velocity board's rejection of Nielsen's resolution to bring the lawsuit

14   against the three directors was a wrongful rejection for the further reason that both

15   Linda Gross and Roger Donaldson, who along with Greg Nielsen were the only

16   disinterested directors on the Velocity board with respect to the resolution to bring

17   the lawsuit, were so swayed by their conflicted loyalties to the three defendants

18   and so dominated by Wolfgang that they could not, and did not, exercise business

19   judgment on the resolution.  Linda Gross had been co-opted by her former husband

20   and compromised by her own economic self-interest as a result of the phone call

21   she received from Richard Gross on the evening prior to the October 25, 2011

22   board meeting and she was likely further swayed to vote against the resolution by

23   Lyle Maul who, as earlier discussed herein, probably made an offer to buy Linda

24   Gross's shares similar to the one he communicated to Pettersen, at IPT.  Donaldson

25   was so dominated by Wolfgang's strong-arming tactics prior to the board meeting,

26   so swayed by his long-standing relationship and loyalty to Wolfgang and he was so

27   compromised by his own economic self-interest that he could not exercise business

28   judgment on the resolution.  Sheri Berke was conflicted and compromised and her

40

First Amended Complaint

1  vote on Nielsen's resolution seeking the board's authority for the corporation to

2  bring the lawsuit cannot be considered disinterested because, as was discussed by

3  Wolfgang and Sheri Berke during the October 25, 2011 board meeting, Sheri

4  Berke was directly involved in the behind-the-scenes, back and forth discussions

5  with Wolfgang that resulted in his decision to violate the board's express

6  instructions contained in the April 6, 2011 resolution authorizing the stock

7  buybacks from Christian Burke and Richard Gross, and Sheri Berke assisted

8  Wolfgang in carrying out his acquisition of those shares by recording the transfers

9  in the corporation's share transfer records.  Sheri Berke was therefore so vested in

10  the wrongdoing described in the proposed lawsuit that she could not possibly have

11  exercised business judgment on Nielsen's resolution.

12       The Velocity board's rejection of Nielsen's resolution to bring the lawsuit

13  against the three directors was a wrongful rejection for the further reason that,

14  under the facts as alleged in the proposed lawsuit and as admitted by Wolfgang and

15  Kirk Retz during the discussion of the resolution, the transactions were so

16  egregious on their face that the Velocity board's rejection of the lawsuit proposed

17  by Nielsen was per se wrongful and constituted a deliberate disregard of the

18  stockholders and thus was gross negligence by the directors who voted against it or

19  abstained without justification.

20  38.  If plaintiff is successful in this action, a substantial benefit will result to

21  Velocity, on whose behalf this action is prosecuted, and plaintiff is entitled to its

22  attorney's fees incurred herein in an amount according to proof against the

23  corporation.

## II. <u>SECOND CAUSE OF ACTION</u>

(Shareholder Suit by IPT against Wolfgang, Burke and Gross for Breach of their
Fiduciary Duty owed to IPT as Directors, Officers and Controlling Shareholders of
Velocity and against DOES 1-10 as Aiders and Abettors)

24

25

26

27

28

First Amended Complaint

cv-11-9950-RGK (AJx)

1   39.  Plaintiff incorporates in this cause of action the allegations in paragraphs 1-

2   38 of the complaint.

3   40.  Plaintiff brings this cause of action in its own right as a minority shareholder

4   against defendants Kurt Wolfgang, Christian Burke and Richard Gross.

5   41.  In the alternative, and without waiving the foregoing causes of action herein

6   alleged, but subject to them, plaintiff alleges that in doing the things hereinabove

7   alleged defendants Wolfgang, Burke and Gross, as directors, officers and

8   controlling shareholders of Velocity, used their power to control the corporation to

9   benefit themselves to the exclusion and detriment of plaintiff and all other minority

10   shareholders of the corporation, and such abuse of their power to control the

11   corporation conflicted with the proper conduct of the corporation's business.  Such

12   abuse of their power to control the corporation constituted breaches of said

13   defendants' fiduciary duties owed to plaintiff and all other minority shareholders of

14   the corporation.

15   42.  As a proximate result of the acts of all of the defendants, as above described,

16   plaintiff has suffered damages.   On information and belief, plaintiff alleges that his

17   damages are at least $500,000, or as shown according to proof.

18   43.  The aforementioned conduct of the defendants was done with the intention of

19   depriving plaintiff of property or legal rights or otherwise causing injury to

20   plaintiff and was an intentional misrepresentation, deceit or concealment of a

21   material fact known to the defendants with the intention on the part of the

22   defendants of thereby depriving plaintiff of property or legal rights or otherwise

23   causing injury so as to justify an award of exemplary and punitive damages.

### III. THIRD CAUSE OF ACTION

(Shareholder Suit by IPT under §304 of the Corporations Code for Removal of
Defendants Wolfgang, Burke and Gross as Directors of Velocity)

27   44.  Plaintiff incorporates in this cause of action the allegations of paragraphs 1-

28   43 of the complaint.

First Amended Complaint

cv-11-9950-RGK (AJx)

45.  Plaintiff brings this cause of action in its own right as a shareholder of Velocity.  Velocity is a defendant in this cause of action as required by §304 of the Corporations Code.  The real defendants in this cause of action are Wolfgang, Burke and Gross.

46.  Plaintiff is the holder of record of 4,152,603 shares of the common stock of Velocity, and said shares constitute more than 10% of the corporation's outstanding common stock.  Velocity has only one class of common stock, and there are no preferred shares outstanding.

47.  Wolfgang, Burke and Gross are and, at all times herein mentioned, were directors of Velocity.

48.  The actions of each of the defendants, including Wolfgang, Burke and Gross, as described above in this complaint, constituted fraudulent and/or dishonest acts by each of said defendants and/or gross abuse of each said defendant's authority and/or gross abuse of each said defendant's discretion with reference to the corporation.

49.  By this action plaintiff seeks removal of Wolfgang, Burke and Gross as directors of the corporation and a judgment that each of them shall be barred from reelection to the office of director for a period of ten years or for such other period as the court prescribes.

PRAYER

WHEREFORE, plaintiff prays judgment as follows:

(a) On the first cause of action, plaintiff demands a declaratory judgment of this court that defendant Kurt Wolfgang holds the 2,268,548 shares of Velocity stock acquired by him from defendants Christian Burke and Richard Gross, as well as any other shares he may at any time have acquired as legal or beneficial owner derived from the corporation's obligations under the stock redemption agreements, or either of them, as a constructive trustee for Velocity, the beneficial owner of

43

First Amended Complaint

cv-11-9950-RGK (AJx)

1  such shares, and directing said defendant to immediately transfer the shares to

2  Velocity;

3    (b)  On the first cause of action, plaintiff demands judgment in behalf of Velocity

4  against defendants Wolfgang, Burke, Gross, Sheri Berke, Lyle Maul and Baker,

5  Burton & Lundy, P.C., jointly and severally, for $7,000,0000, or in an amount

6  according to proof, and for interest on the damages from and after the date of the

7  sale of the Data Center;

8    (c)  On the first cause of action, plaintiff demands judgment in behalf of Velocity

9  against defendants Wolfgang, Burke, Gross, Sheri Berke, Lyle Maul and Baker,

10  Burton & Lundy, P.C., jointly and severally, for exemplary and punitive damages;

11    (d)  On the first cause of action, plaintiff demands a declaratory judgment that

12  Velocity is relieved of any further obligation to perform under the Burke and Gross

13  Stock Redemption Agreements and that such purported agreements are void and

14  rescinded;

15    (e)  On the first cause of action, plaintiff demands judgment for reasonable

16  attorney's fees in an amount according to proof, and for costs of suit herein

17  incurred;

18    (f)  On the second cause of action, in the alternative and subject to the derivative

19  causes of action, plaintiff demands judgment in behalf of IPT against defendants

20  Wolfgang, Burke and Gross for $500,000 or in an amount according to proof, for

21  exemplary and punitive damages, for interest on the damages and for plaintiff's

22  costs of suit herein incurred;

23    (g)  On the third cause of action, plaintiff demands judgment removing

24  defendants Wolfgang, Burke and Gross as directors of Velocity and barring each of

25  them from reelection to the office of director for a period of ten years or such other

26  period as the court prescribes;

27    (h)  On the third cause of action, plaintiff demands judgment against defendants

28  Wolfgang, Burke and Gross for its costs of suit herein incurred; and;

First Amended Complaint

cv-11-9950-RGK (AJx)

1    Plaintiff seeks such other and further relief as the court deems proper.

2

3                                        Respectfully submitted,

4

5                                        *Gerald P. Burleson*

6                                        Gerald P. Burleson
                                         Attorney for Plaintiff,
7                                        IP TELESIS, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

First Amended Complaint

                                                    cv-11-9950-RGK (AJx)

Exhibit #1

# STOCK REDEMPTION AGREEMENT

THIS STOCK REDEMPTION AGREEMENT (herein called "Agreement") is made effective as of the 1st day of July, 2011, between **VELOCITY NETWORKS, INC.** a California corporation (herein called "Buyer") and **CHRISTIAN BURKE** (herein called "Seller").

## RECITALS

A.     Seller is the owner and holder of 3,693,669 shares of the common stock of Buyer, a California corporation (hereinafter sometimes called the "Corporation" and/or "Buyer").

B.     The Corporation operates a telecommunications business from the premises located at 5155 Rosecrans Avenue, Suite 100, Hawthorne, CA 90250 (herein called the "Business").

C.     Seller agrees to sell to Buyer all of his 3,693,669 shares (herein called the "Shares"), and Buyer agrees to purchase and redeem from Seller, the Shares for the consideration and upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the agreements set forth herein, Seller and Buyer hereby agree as follows:

1.     **Purchase and Sale of Shares**.  Subject to the terms and conditions hereinafter set forth, on the Closing Dates as defined below, Seller hereby agrees to sell, convey, transfer, assign and deliver to Buyer the Shares, and Buyer hereby agrees to purchase the Shares on the terms and conditions set forth herein. The purchases and sales will occur pursuant to a series of transactions to be consummated on the following dates (each a "Closing Date" and collectively the "Closing Dates"). On each of the Closing Dates, the Company shall purchase, and Seller shall sell the number of Shares specified for the consideration indicated in each transaction.

| Closing Date | Number of Shares Sold | Purchase Price |
|---|---|---|
| 4/15/12 | 602,500 | $100,000.00 |
| 4/15/13 | 602,500 | $100,000.00 |
| 4/15/14 | 602,500 | $100,000.00 |
| 4/15/15 | 1,515,152 | $100,000.00 |
| 4/15/16 | 371,017 | $ 25,000.00 |
| Total | 3,693,669 | $ 425,000.00 |

1

Notwithstanding the above provisions, the parties acknowledge that the anticipated revenues to be used to complete the purchases described above are coming from the In-N-Out annual receivables. In the event that In-N-Out discontinues or substantially reduces its business with the Corporation, then in lieu of the payments described above, on each Closing Date the Corporation will execute a promissory note for the amount of the payment. Each promissory note will provide that the principal balance will be paid in twelve (12) equal monthly installments on the fifteenth (15th) day of each month, commencing on each May 15, 2012 and continuing through April 15th of the following calendar year, and otherwise in the form attached hereto as *Exhibit* A. Notwithstanding the above, provided that prior to the first of the Closing Dates set forth above (i.e. April 15, 2012), Seller shall be entitled to provide notice to Buyer that he does not wish to sell the Shares to be sold on that Closing Date, in which event that transaction will be terminated, and Seller shall not be required to sell those Shares or any of his other Shares to Buyer pursuant to the above provisions. Once the first Closing Date occurs and the first sale is consummated, Seller shall no longer have the right to cancel any of the other transactions.

2.     **Purchase Price**.  As described above, the aggregate purchase price (herein called the "Purchase Price") shall be the sum of FOUR HUNDRED TWENTY-FIVE THOUSAND and 00/100 DOLLARS ($425,000.00).

3.     **Seller's Covenants**.   In addition to such other obligations as Seller may have hereunder, Seller shall do as follows:

(i)     **Delivery of Shares**.  At each Closing Date, Seller shall endorse and assign to Buyer the stock certificate(s) evidencing the Shares being sold on that Closing Date.

(ii)     **Resignation as Officer**.  Effective on June 30, 2011, Seller shall resign as an officer and employee of the Corporation.

4.     **Buyer's Covenants**.   In addition to such other obligations as Buyer may have hereunder, Buyer shall do as follows:

(i)     **Payment of Compensation**.  Buyer shall cause each of the payments described in Section 1 to be paid to Seller in a timely manner.

(ii)     **Life Insurance**.  The Corporation will continue to fund the existing life insurance policies described on *Exhibit* B attached hereto covering Seller and his former spouse, for so long as Seller continues to be a guarantor of any of the Corporation's leases or other material obligations including without limitation the Corporation's credit line with California Bank and Trust.

(iii)     **Health and Dental Insurance**.  For so long as Seller continues to be a guarantor of any of the Corporation's leases or other material obligations including without limitation the Corporation's credit line with California Bank and Trust, the Corporation will pay the

2

premiums for the health and dental insurance coverage for Seller and his dependants pursuant to a Blue Shield Savings 2500-Family and Guardian PPO Dental Plan, or equivalent.

    5.    **Representations, Warranties, and Further Covenants of Seller**. Seller represents, warrants, and covenants as of the date of this Agreement, and as of each of the Closing Dates, as follows:

        (i)    **No Outstanding Rights**. Seller will not have outstanding any options, rights, or warrants relating to the issuance, purchase or, except as expressly set forth herein, sale of the Corporation's capital stock or its equity securities.

        (ii)    **Ownership of Shares**. As of each Closing Date, Seller will own the portion of the Shares to be sold on that date free and clear of all liens, security agreements, shareholders' agreements, voting trust agreements, and other claims and encumbrances, and there will be no outstanding options, warrants, contracts, or other rights of any character which may entitle any person to acquire any of the Shares.

        (iii)    **No Brokers**. Seller has not engaged any broker, finder or similar agent in connection with the transactions contemplated by this Agreement.

        (iv)    **Examination of Records**. Seller has had the opportunity to consult with independent counsel and to examine all books, records, financial statements and all other documents relating to the Corporation, its assets and liabilities and the value of the Shares. In that regard, Seller has had the opportunity to make a full inquiry and evaluation of the value of the Shares and the Purchase Price. Seller, in entering into this Agreement, is relying solely upon his investigation and not upon any warranties or representations of Buyer, except as expressly set forth herein. Based upon his investigation, Seller is satisfied that the Purchase Price is fair, just and equitable.

        (v)    **No Claims Against Corporation**. Seller has no actual knowledge of any claims against the Corporation, not known to the Corporation's Board of Directors, which could have a materially adverse effect on the Shares, the Corporation or the Business.

        (vi)    **No Claims for Compensation**. As of the Closing, except for receipt of the compensation and benefits described in Section 4 hereinabove and receipt of the Purchase Price, Seller will have no claims against the Corporation for any compensation, employment benefits, dividends, loan payments or other claims arising from his ownership of the Shares or employment or other involvement with the Corporation.  Any such claims will be null and void as of the Closing. Notwithstanding the above, for all periods during which Seller continues to own shares of the Corporation's capital stock, Seller will be entitled to all benefits resulting therefrom, including without limitation any right to receive dividends, and any and all voting rights.

    6.    **Representations, Warranties, and Further Covenants of Buyer**. Buyer represents, warrants, and covenants as of the date of this Agreement, and as of the Closing, as follows:

(i) **No Brokers**. Buyer has not engaged any broker, finder, or similar agent in connection with the transactions contemplated by this Agreement.

(ii) **Examination of Records**. Buyer has had the opportunity to consult with independent counsel and to examine all books, records, financial statements and all other documents relating to the Corporation, its assets and liabilities and the value of the Shares. In that regard, Buyer has had the opportunity to make a full inquiry and evaluation of the value of the Shares. Buyer, in entering into this Agreement, is relying solely upon its own investigation and not upon any warranties or representations of Seller, except as expressly set forth herein. Based upon its investigation, Buyer is satisfied that the purchase price is fair, just and equitable.

7. **Securities Representations**. The parties agree with and represent and warrant to each other as follows:

(i) Corporation is a corporation duly organized and in good standing under the laws of the State of California.

(ii) Corporation is the issuer of the Shares being purchased hereunder.

(iii) This Agreement has been approved by the Corporation's Board of Directors.

8. **Seller's Indemnifications**. Seller hereby agrees to hold harmless, indemnify, and defend Buyer from and against any claim, liability, other obligation or loss, and expenses related thereto (including reasonable attorney's fees) which Buyer incurs by reason of any breach by Seller of his representations, warranties, covenants and/or agreements made herein.

9. **Buyer's Indemnifications**. Buyer hereby agrees to hold harmless, indemnify, and defend Seller, from and against any claim, liability, obligation, loss, and expense (including reasonable attorneys' fees) which Seller incurs by reason of: (i) any breach by Buyer of its representations, warranties, covenants and/or agreements made herein; or (ii) any third-party claims asserted against Seller arising from his position as an officer, director, employee or shareholder of Buyer, except to the extent that such claim arises out of his own active negligence or willful misconduct.

10. Intentionally Omitted.

11. **Continuing Rights**. Until completion of each of the transactions described herein, Seller shall retain all rights with regard to the unsold portion of the Shares, including the rights to receive any dividends or other distributions, and to exercise all voting rights arising from the ownership of said unsold shares. Seller further agrees that so long as this Agreement remains in effect, Seller will not sell, transfer, convey or hypothecate his interest in any of the unsold Shares without Buyer's consent, which may be granted or withheld in Buyer's sole discretion.

12.   **Closings**.  The consummation of the purchase and sale transactions contemplated hereby (each herein referred to as a "Closing") shall occur on each of the dates set forth in Section 1, at the principal place of the Business, or at such other time and place as the parties shall agree. Notwithstanding the above, if for any reason on the April 15th Closing Date described in Section 1 the Corporation is unable to meet the requirements of Corporation's Code Section 500 or 501, then the Corporation shall be entitled to extend such Closing Date until such time as it is able to meet those requirements. The parties acknowledge and agree that Baker, Burton & Lundy, P.C. has drafted this Agreement according to the terms negotiated between the parties, and is not representing either party in its individual capacity with regard to this transaction. Buyer and Seller have each been advised to obtain independent legal and tax advice as to the terms and conditions hereof and its/his rights and obligations hereunder.

12.1.   **Closing Deliveries**.   In addition to any deliveries that this Agreement contemplates are to be made at each Closing, each party shall make the following deliveries at the Closing:

(i)   **Seller's Deliveries to Buyer**.  At each Closing, Seller shall deliver to Buyer, the requisite Shares and suitable stock powers to consummate the transfer thereof to Buyer.

(ii)   **Buyer's Delivery to Seller**.  At each Closing, Buyer shall deliver to Seller the purchase price of said Shares (or the promissory note therefor) as described in Section 1 of this Agreement.

13.   **Miscellaneous Provisions**.

13.1.   **Notices**.  Except as expressly provided to the contrary herein, any notice, consent, report, demand, document, or other such item to be delivered to Buyer or Seller hereunder shall be deemed delivered and received when given in writing and personally delivered to the applicable party, or three (3) days after deposit in the United States Mail, first class, postage prepaid; in either case it shall be delivered to the address or addresses indicated for such party below, and/or to such other person or address as such party may from time to time by written notice designate to the other:

If to Buyer/Corporation:      VELOCITY NETWORKS, INC.
                                      5155 Rosecrans Avenue, Suite 100
                                      Hawthorne, CA 90250

If to Seller:      Christian Burke
                  2629 Manhattan Ave., # 143
                  Hermosa Beach, CA 90254

13.2. **Binding Effect.** Except as otherwise expressly provided herein, this Agreement shall bind and inure to the benefit of Buyer and Seller and their respective heirs, successors, assigns and personal representatives.

13.3. **Entire Agreement; Modification.** This Agreement constitutes the entire agreement between the Buyer and Seller pertaining to the subject matter hereof and supersedes all prior agreements, understandings, and representations of the parties hereto with respect to the subject matter hereof. This Agreement may not be modified, amended, supplemented, or otherwise changed, except by a writing executed by Buyer and Seller.

13.4. **Counterparts.** This Agreement, and any amendment hereto, may be executed in any number of counterparts and by each party on separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which taken together shall constitute but one and the same instrument.

13.5. **Survival of Provisions.** The representations, warranties, covenants and indemnifications made by Seller in Sections 3, 5, and 8 hereof and by Buyer in Sections 4, 6, and 9 hereof, shall survive the Closing and be deemed renewed at and as of the Closing.

13.6. **Invalidity of Certain Provisions.** The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision hereof.

13.7. **Further Assurances.** Buyer and Seller mutually covenant and agree to perform such acts, execute and deliver such instruments and documents, and do all such other things as may be reasonable necessary and desirable in order to carry out the purposes and intent of this Agreement.

13.8. **MEDIATION/ARBITRATION OF DISPUTES.** Any dispute or controversy arising under this Agreement, or in connection with any of the terms and conditions hereof, shall be referred by the parties hereto for mediation. A third party, neutral mediation service shall be selected, as agreed upon by the parties and the costs and expenses thereof shall be borne equally by the parties hereto. The parties agree to utilize their good faith efforts to resolve any such dispute or controversy so submitted to mediation. It is specifically understood and agreed by the parties hereto that referral of any such dispute or controversy, and mutual good faith efforts to resolve the same thereby, shall be conditions precedent to the institution of any arbitration, action or proceeding, whether at law or in equity, with respect to any such dispute or controversy. All matters concerning the mediation, including all communications between the parties, are to be privileged pursuant to the California Evidence Code and cannot be used in any subsequent arbitration or litigation. If any party commences an action based upon a dispute or claim to which this paragraph applies (and which is not excluded from the provisions hereof as described below), without first attempting to resolve the matter through mediation, then that party shall not be entitled to recover attorneys' fees, even if they would otherwise be available to that party in such action. The following matters are excluded from the provisions of this Section 13.8: (i) an unlawful detainer action; (ii) the filing or enforcement of a mechanic's lien; and (iii) any matter which is in the jurisdiction of a probate, small claims or bankruptcy court. The filing of

a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a violation of the provisions of this Section 13.8.

      If after attempting mediation, the parties are unable to resolve their dispute, then such dispute shall be resolved by arbitration before a retired judge of the Superior Court of the State of California for the County of Los Angeles in the following manner:

      (a)    The arbitration shall begin by one party serving a demand for arbitration upon the other party. The parties, or their legal counsel, shall thereafter attempt to agree upon the selection of an arbitrator. If they are unable to so agree within ten (10) days of the serving of the demand, then either party shall be entitled to petition the Superior Court for the appointment of an arbitrator.

      (b)    The arbitration shall take place in Los Angeles County, California, at a time and place selected by the arbitrator.

      (c)    The parties to the arbitration may have all rights and powers afforded to a civil litigant in Los Angeles Superior Court, including the ability to conduct full discovery, except that absent stipulation to the contrary, all discovery is to be completed within sixty (60) days of the appointment of the arbitrator, and the arbitration is to be scheduled within ninety (90) days thereof. The arbitrator shall be governed by the rules of civil procedure for actions filed in California Superior Courts as set forth in the California Code of Civil Procedure ("CCP"). The arbitrator may deviate from the rules of the CCP by stipulation of the parties.

      (d)    The parties shall evenly divide the costs of the arbitrator's fees. The arbitrator shall have the power, as part of any award, to include these fees as an element of recovery.

      (e)    Should the arbitrator at any time prior to the commencement of the arbitration hearing become incapacitated or otherwise unable to fulfill his or her duties, the parties agree to seek a mutually agreeable replacement.

      (f)    The procedure for implementing or challenging the arbitrator's decision shall be that set forth in CCP 1285, et seq., relating to the confirmation, correction or vacation of arbitration awards. Except as set forth by that procedure, the arbitrator's award shall be considered final, and not subject to appeal or collateral attack.

      (g)    **NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION/MEDIATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE**

SPECIFICALLY INCLUDED IN THE "ARBITRATION/MEDIATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION/MEDIATION OF DISPUTES" PROVISION TO NEUTRAL MEDIATION/ARBITRATION.

SELLER'S INITIALS _____        BUYER'S INITIALS _____

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first above written.

BUYER:                                          SELLER:

VELOCITY NETWORKS, INC.
A California Corporation

By: _____                  _____
        KURT WOLFGANG                           CHRISTIAN BURKE
Its:    President

Velocity Networks-Burke Stock Redemption Agree- 063011.wpd

8

Exhibit #2

# STOCK REDEMPTION AGREEMENT

THIS STOCK REDEMPTION AGREEMENT (herein called "Agreement") is made effective as of the 1st day of July, 2011, between **VELOCITY NETWORKS, INC.** a California corporation (herein called "Buyer") and **RICHARD GROSS** (herein called "Seller").

## RECITALS

A.     Seller is the owner and holder of 1,356,000 shares of the common stock of Buyer, a California corporation (hereinafter sometimes called the "Corporation" and/or "Buyer").

B.     The Corporation operates a telecommunications business from the premises located at 5155 Rosecrans Avenue, Suite 100, Hawthorne, CA 90250 (herein called the "Business").

C.     Seller agrees to sell to Buyer all of his 1,356,000 shares (herein called the "Shares"), and Buyer agrees to purchase and redeem from Seller, the Shares for the consideration and upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the agreements set forth herein, Seller and Buyer hereby agree as follows:

1.     **Purchase and Sale of Shares**.  Subject to the terms and conditions hereinafter set forth, on the Closing Dates as defined below, Seller hereby agrees to sell, convey, transfer, assign and deliver to Buyer the Shares, and Buyer hereby agrees to purchase the Shares on the terms and conditions set forth herein. The purchases and sales will occur pursuant to a series of transactions to be consummated on the following dates (each a "Closing Date" and collectively the "Closing Dates"). On each of the Closing Dates, the Company shall purchase, and Seller shall sell the number of Shares specified for the consideration indicated in each transaction.

| Closing Date | Number of Shares Sold | Purchase Price |
|---|---|---|
| 4/15/12 | 602,000 | $ 99,932 |
| 4/15/13 | 602,000 | $ 99,932 |
| 4/15/14 | 152,000 | $ 25,232 |
| Total | 1,356,000 | $ 225,096 |

Notwithstanding the above provisions, the parties acknowledge that the anticipated revenues to be used to complete the purchases described above are coming from the In-N-Out annual receivables. In

1    18

07/25/2011  06:49   3102203013        VELOCITY NETWORK           PAGE  02/11

the event that In-N-Out discontinues or substantially reduces its business with the Corporation, then in lieu of the payments described above, on each Closing Date the Corporation will execute a promissory note for the amount of the payment. Each promissory note will provide that the principal balance will be paid in twelve (12) equal monthly installments on the fifteenth (15th) day of each month, commencing on each May 15, 2012 and continuing through April 15th of the following calendar year, and otherwise in the form attached hereto as *Exhibit* A. Notwithstanding the above, at any time prior to each of the Closing Dates set forth above, Seller shall be entitled to provide notice to Buyer that he does not wish to sell the Shares to be sold on that Closing Date, in which event that transaction will be terminated, and Seller shall not be required to sell those Shares to Buyer pursuant to the above provisions.

2.      **Purchase Price**.  As described above, the aggregate purchase price (herein called the "Purchase Price") shall be the sum of TWO HUNDRED TWENTY-FIVE THOUSAND and NINETY-SIX DOLLARS ($225,096.00).

3.      **Seller's Covenants**.  In addition to such other obligations as Seller may have hereunder, Seller shall do as follows:

(i)      **Delivery of Shares**.  At each Closing Date, Seller shall endorse and assign to Buyer the stock certificate(s) evidencing the Shares being sold on that Closing Date.

(ii)      **Resignation as Officer**.  Effective on June 30, 2011, Seller shall resign as an officer and employee of the Corporation.

4.      **Buyer's Covenants**.  In addition to such other obligations as Buyer may have hereunder, Buyer shall do as follows:

(i)      **Payment of Compensation**.  Buyer shall cause each of the payments described in Section 1 to be paid to Seller in a timely manner.

(ii)      **Life Insurance**.  The Corporation will continue to fund the existing life insurance policies described on *Exhibit* B attached hereto covering Seller and his domestic partner, Patricia Jung, for so long as Seller continues to be a guarantor of any of the Corporation's leases or other material obligations including without limitation the Corporation's credit line with California Bank and Trust.

(iii)      **Health and Dental Insurance**.  For so long as Seller continues to be a guarantor of any of the Corporation's leases or other material obligations including without limitation the Corporation's credit line with California Bank and Trust, the Corporation will pay the premiums for the health and dental insurance coverage with the existing policies for Seller and his dependants pursuant to a Blue Shield Savings 2500-Family and Guardian PPO Dental Plan, or equivalent.

2 of 8

(iv)    **Additional Benefits**. For so long as Seller continues to be a guarantor of any of the Corporation's leases or other material obligations including without limitation the Corporation's credit line with California Bank and Trust, the Corporation will maintain for Seller:

(a)    Fax # 310-263-4864 PDF to rich@vel.net;

(b)    Email addresses rich@vel.net, Richard@vel.net, Rodney@vel.net, patricia@vel.net, rich@beachnet.com, and Rodney@beachnet.com;

(c)    Access to Velocity Networks corporate exchange via Remote; and

(d)    VOIP Business Seat and phone #310-263-4855

5.    **Representations, Warranties, and Further Covenants of Seller**. Seller represents, warrants, and covenants as of the date of this Agreement, and as of each of the Closing Dates, as follows:

(i)    **No Outstanding Rights**. Seller will not have outstanding any options, rights, or warrants relating to the issuance, purchase or, except as expressly set forth herein, sale of the Corporation's capital stock or its equity securities.

(ii)    **Ownership of Shares**. As of each Closing Date, Seller will own the portion of the Shares to be sold on that date free and clear of all liens, security agreements, shareholders' agreements, voting trust agreements, and other claims and encumbrances, and there will be no outstanding options, warrants, contracts, or other rights of any character which may entitle any person to acquire any of the Shares.

(iii)    **No Brokers**. Seller has not engaged any broker, finder or similar agent in connection with the transactions contemplated by this Agreement.

(iv)    **Examination of Records**. Seller has had the opportunity to consult with independent counsel and to examine all books, records, financial statements and all other documents relating to the Corporation, its assets and liabilities and the value of the Shares. In that regard, Seller has had the opportunity to make a full inquiry and evaluation of the value of the Shares and the Purchase Price. Seller, in entering into this Agreement, is relying solely upon his investigation and not upon any warranties or representations of Buyer, except as expressly set forth herein. Based upon his investigation, Seller is satisfied that the Purchase Price is fair, just and equitable.

(v)    **No Claims Against Corporation**. Seller has no actual knowledge of any claims against the Corporation, not known to the Corporation's Board of Directors, which could have a materially adverse effect on the Shares, the Corporation or the Business.

3 of 8

(vi)    **No Claims for Compensation**. As of the Closing, except for receipt of the compensation and benefits described in Section 4 hereinabove and receipt of the Purchase Price, Seller will have no claims against the Corporation for any compensation, employment benefits, dividends, loan payments or other claims arising from his ownership of the Shares or employment or other involvement with the Corporation.  Any such claims will be null and void as of the Closing. Notwithstanding the above, for all periods during which Seller continues to own shares of the Corporation's capital stock, Seller will be entitled to all benefits resulting therefrom, including without limitation any right to receive dividends, and any and all voting rights.

6.    **Representations, Warranties, and Further Covenants of Buyer**.  Buyer represents, warrants, and covenants as of the date of this Agreement, and as of the Closing, as follows:

(i)    **No Brokers**.  Buyer has not engaged any broker, finder, or similar agent in connection with the transactions contemplated by this Agreement.

(ii)    **Examination of Records**.  Buyer has had the opportunity to consult with independent counsel and to examine all books, records, financial statements and all other documents relating to the Corporation, its assets and liabilities and the value of the Shares. In that regard, Buyer has had the opportunity to make a full inquiry and evaluation of the value of the Shares.  Buyer, in entering into this Agreement, is relying solely upon its own investigation and not upon any warranties or representations of Seller, except as expressly set forth herein. Based upon its investigation, Buyer is satisfied that the purchase price is fair, just and equitable.

7.    **Securities Representations**. The parties agree with and represent and warrant to each other as follows:

(i)    Corporation is a corporation duly organized and in good standing under the laws of the State of California.

(ii)    Corporation is the issuer of the Shares being purchased hereunder.

(iii)    This Agreement has been approved by the Corporation's Board of Directors.

8.    **Seller's Indemnifications**.  Seller hereby agrees to hold harmless, indemnify, and defend Buyer from and against any claim, liability, other obligation or loss, and expenses related thereto (including reasonable attorney's fees) which Buyer incurs by reason of any breach by Seller of his representations, warranties, covenants and/or agreements made herein.

9.    **Buyer's Indemnifications**.  Buyer hereby agrees to hold harmless, indemnify, and defend Seller, from and against any claim, liability, obligation, loss, and expense (including reasonable attorneys' fees) which Seller incurs by reason of: (i) any breach by Buyer of its representations, warranties, covenants and/or agreements made herein; or (ii) any third-party claims asserted against

4  of  8

Seller arising from his position as an officer, director, employee or shareholder of Buyer, except to the extent that such claim arises out of his own active negligence or willful misconduct.

10.     Intentionally Omitted.

11.     **Continuing Rights**. Until completion of each of the transactions described herein, Seller shall retain all rights with regard to the unsold portion of the Shares, including the rights to receive any dividends or other distributions, and to exercise all voting rights arising from the ownership of said unsold shares. Seller further agrees that so long as this Agreement remains in effect, Seller will not sell, transfer, convey or hypothecate his interest in any of the unsold Shares without Buyer's consent, which may be granted or withheld in Buyer's sole discretion.

12.     **Closings**. The consummation of the purchase and sale transactions contemplated hereby (each herein referred to as a "Closing") shall occur on each of the dates set forth in Section 1, at the principal place of the Business, or at such other time and place as the parties shall agree. Notwithstanding the above, if for any reason on the April 15th Closing Date described in Section 1 the Corporation is unable to meet the requirements of Corporation's Code Section 500 or 501, then the Corporation shall be entitled to extend such Closing Date until such time as it is able to meet those requirements. The parties acknowledge and agree that Baker, Burton & Lundy, P.C. has drafted this Agreement according to the terms negotiated between the parties, and is not representing either party in its individual capacity with regard to this transaction. Buyer and Seller have each been advised to obtain independent legal and tax advice as to the terms and conditions hereof and its/his rights and obligations hereunder.

12.1.   **Closing Deliveries**.   In addition to any deliveries that this Agreement contemplates are to be made at each Closing, each party shall make the following deliveries at the Closing:

(i)     **Seller's Deliveries to Buyer**.  At each Closing, Seller shall deliver to Buyer, the requisite Shares and suitable stock powers to consummate the transfer thereof to Buyer.

(ii)    **Buyer's Delivery to Seller**.  At each Closing, Buyer shall deliver to Seller the purchase price of said Shares (or the promissory note therefor) as described in Section 1 of this Agreement.

13.     **Miscellaneous Provisions**.

13.1.   **Notices**.  Except as expressly provided to the contrary herein, any notice, consent, report, demand, document, or other such item to be delivered to Buyer or Seller hereunder shall be deemed delivered and received when given in writing and personally delivered to the applicable party, or three (3) days after deposit in the United States Mail, first class, postage prepaid; in either case it shall be delivered to the address or addresses indicated for such party below, and/or to

such other person or address as such party may from time to time by written notice designate to the other:

|  |  |
|---|---|
| If to Buyer/Corporation: | VELOCITY NETWORKS, INC.<br>5155 Rosecrans Avenue, Suite 100<br>Hawthorne, CA 90250 |
| If to Seller: | Richard Gross<br>3350 Moore Street<br>Los Angeles, CA 90066 |

13.2.  **Binding Effect**. Except as otherwise expressly provided herein, this Agreement shall bind and inure to the benefit of Buyer and Seller and their respective heirs, successors, assigns and personal representatives.

13.3.  **Entire Agreement; Modification**.  This Agreement constitutes the entire agreement between the Buyer and Seller pertaining to the subject matter hereof and supersedes all prior agreements, understandings, and representations of the parties hereto with respect to the subject matter hereof. This Agreement may not be modified, amended, supplemented, or otherwise changed, except by a writing executed by Buyer and Seller.

13.4.  **Counterparts**. This Agreement, and any amendment hereto, may be executed in any number of counterparts and by each party on separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which taken together shall constitute but one and the same instrument.

13.5.  **Survival of Provisions**.  The representations, warranties, covenants and indemnifications made by Seller in Sections 3, 5, and 8 hereof and by Buyer in Sections 4, 6, and 9 hereof, shall survive the Closing and be deemed renewed at and as of the Closing.

13.6.  **Invalidity of Certain Provisions**.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision hereof.

13.7.  **Further Assurances**. Buyer and Seller mutually covenant and agree to perform such acts, execute and deliver such instruments and documents, and do all such other things as may be reasonable necessary and desirable in order to carry out the purposes and intent of this Agreement.

13.8.  **MEDIATION/ARBITRATION OF DISPUTES**. Any dispute or controversy arising under this Agreement, or in connection with any of the terms and conditions hereof, shall be referred by the parties hereto for mediation. A third party, neutral mediation service shall be selected, as agreed upon by the parties and the costs and expenses thereof shall be borne equally by the parties hereto. The parties agree to utilize their good faith efforts to resolve any such dispute or controversy so submitted to mediation. It is specifically understood and agreed by the parties hereto that referral of

6

any such dispute or controversy, and mutual good faith efforts to resolve the same thereby, shall be conditions precedent to the institution of any arbitration, action or proceeding, whether at law or in equity, with respect to any such dispute or controversy. All matters concerning the mediation, including all communications between the parties, are to be privileged pursuant to the California Evidence Code and cannot be used in any subsequent arbitration or litigation. If any party commences an action based upon a dispute or claim to which this paragraph applies (and which is not excluded from the provisions hereof as described below), without first attempting to resolve the matter through mediation, then that party shall not be entitled to recover attorneys' fees, even if they would otherwise be available to that party in such action. The following matters are excluded from the provisions of this Section 13.8: (i) an unlawful detainer action; (ii) the filing or enforcement of a mechanic's lien; and (iii) any matter which is in the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a violation of the provisions of this Section 13.8.

If after attempting mediation, the parties are unable to resolve their dispute, then such dispute shall be resolved by arbitration before a retired judge of the Superior Court of the State of California for the County of Los Angeles in the following manner:

(a)     The arbitration shall begin by one party serving a demand for arbitration upon the other party. The parties, or their legal counsel, shall thereafter attempt to agree upon the selection of an arbitrator. If they are unable to so agree within ten (10) days of the serving of the demand, then either party shall be entitled to petition the Superior Court for the appointment of an arbitrator.

(b)     The arbitration shall take place in Los Angeles County, California, at a time and place selected by the arbitrator.

(c)     The parties to the arbitration may have all rights and powers afforded to a civil litigant in Los Angeles Superior Court, including the ability to conduct full discovery, except that absent stipulation to the contrary, all discovery is to be completed within sixty (60) days of the appointment of the arbitrator, and the arbitration is to be scheduled within ninety (90) days thereof. The arbitrator shall be governed by the rules of civil procedure for actions filed in California Superior Courts as set forth in the California Code of Civil Procedure ("CCP"). The arbitrator may deviate from the rules of the CCP by stipulation of the parties.

(d)     The parties shall evenly divide the costs of the arbitrator's fees. The arbitrator shall have the power, as part of any award, to include these fees as an element of recovery.

(e)     Should the arbitrator at any time prior to the commencement of the arbitration hearing become incapacitated or otherwise unable to fulfill his or her duties, the parties agree to seek a mutually agreeable replacement.

7   of  8

(f)     The procedure for implementing or challenging the arbitrator's decision shall be that set forth in CCP 1285, et seq., relating to the confirmation, correction or vacation of arbitration awards. Except as set forth by that procedure, the arbitrator's award shall be considered final, and not subject to appeal or collateral attack.

(g)     NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION/MEDIATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION/MEDIATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION/MEDIATION OF DISPUTES" PROVISION TO NEUTRAL MEDIATION/ARBITRATION.

SELLER'S INITIALS _Rutr_ BUYER'S INITIALS _____

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first above written.

BUYER:                                          SELLER:

VELOCITY NETWORKS, INC.
A California Corporation

By: _____                       _Richard W. Gross_

Its:   President                                RICHARD GROSS
       KURT WOLFGANG
                                                7/1/2011

Velocity Networks-Gross Stock Redemption Agree - 063011.wpd

8

# EXHIBIT A

## UNSECURED
## PROMISSORY NOTE

Principal Sum: $_____.00

Hawthorne, California
April 15, _____

1.    *Promise to Pay.* For value received the undersigned (Maker) promises to pay to **RICHARD GROSS** (Holder), or order, at 3350 Moore Street, Los Angeles, California 90066, or such other place as Holder may from time to time designate in writing, the principal sum of _____ and NO/100 DOLLARS ($_____), with interest on the unpaid principal balance, from the date hereof until this Note is paid in full at the rate of six percent (6%) interest per annum.

2.    *Terms of Payment.* Principal and interest shall be payable in twelve (12) consecutive equal monthly installments of _____ and ____/100 Dollars ($_____) [i.e. 12-month amortization], beginning on May 15, _____ and continuing on the same date of each and every month thereafter. All payments shall be made in lawful money of the United States and shall be free from set off, deduction, or counterclaim of any kind.

3.    *Prepayment of Principal.* Maker may prepay this Note in whole or in part on any date without premium or penalty. Unless Holder shall elect otherwise, any partial prepayment shall be credited first to accrued interest and then to the principal amount outstanding and shall not extend or postpone the due date of any subsequent payment or change the amount of such payment. The entire unpaid principal shall be due one (1) year from the date hereof.

4.    *Late Payment Charges.* Maker and Holder agree that it would be impractical or extremely difficult to fix the amount of extra expenses involved in handling a delinquent payment which Holder will incur if any installment shall not be paid when due. Accordingly, Maker agrees to pay to Holder, to cover extra expenses incurred by Holder in handling the delinquent payment, a late payment charge of six percent (6%) of the installment due which Maker agrees is a reasonable estimate of the extra expenses Holder will incur if there is a late payment. The late payment charge shall be imposed if any part or all of any installment is not received by Holder within ten (10) days after the date on which it is due.

5.    *Default.* At the option of Holder, upon written notice to Maker, and regardless of any prior forbearance, all sums remaining unpaid under this Note shall become immediately due and payable upon the occurrence of a default by Maker under this Note. The occurrence of any of the following events shall constitute a default by Maker under this Note: (a) Makers failure to make any payment when due under the terms of this Note; (b) Makers failure to perform any of Makers agreements contained in this Note; (c) the filing of a petition in bankruptcy by, or the initiation of any proceeding under any bankruptcy or insolvency laws against, Maker; or (d) the making of a

1 of 2

general assignment for the benefit of creditors by Maker;  Time is of the essence in this Note. No delay or omission on the part of Holder in exercising any right under this Note or any other agreement or instrument securing this Note shall operate as a waiver of such right on any future occasion or of any other rights under this Note or any agreement or instrument securing this Note. All rights and remedies of Holder provided for in this Note are cumulative and shall be in addition to all other rights and remedies provided by law or in equity.

6.     *Costs and Attorneys Fees*. If this Note is not paid when due, or any default described in Paragraph 5 above shall occur, or any dispute arises regarding the interpretation of this Note, Maker hereby promises to pay all costs of collection, including, but not limited to, reasonable attorneys= fees, incurred by Holder to enforce or interpret the terms and conditions of this Note whether or not litigation is instituted.

7.     *Successors; Captions; Governing Law*. The covenants and agreement contained in this Note shall bind, and the rights under this Note shall benefit, the respective successors, heirs, representatives and permitted assigns of Holder and Maker. The captions of the paragraphs of this Note are for convenience only and are not to be used to interpret or define the provisions of this Note. This Note shall be governed by and construed in accordance with the laws of the State of California and the parties consent to the jurisdiction of California state and federal district courts over this Note and the obligations hereunder.

8.     *Severability*. If any provision or provisions of this Note are held to be invalid, illegal or unenforceable in any respect, this Note shall be construed as not containing such provision or provisions and all other provisions of this Note shall remain in full force and effect, and to this end the provisions of this Note are declared to be severable.

9.     *Compliance with Law*. It is the intention of Maker and Holder to comply with all applicable usury laws. Therefore, all agreements between Maker and Holder are expressly limited so that in no event shall the amount paid or agreed to be paid to Holder for the use, forbearance, or detention of money under this Note exceed the maximum permissible under applicable law.

MAKER:

VELOCITY NETWORKS, INC.

By:     _____
        KURT WOLFGANG
Its:     President

Velocity-Gross Promissory Note

2



# Northwestern Mutual

720 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
www.northwesternmutual.com

**EXHIBIT B**

## Billing Notice

**Account Number:** 9747211
Prepared: June 8, 2011

**Questions About This Notice?**
www.northwesternmutual.com
Call: 1-800-388-8123

10133821580021547
Velocity Networks Inc
5165 Rosecrans Ave
Suite 100
Hawthorne CA 90250

JUN 1 3 2011

**Your Financial Representative**
Robert A  Grimm, CLU, ChFC
Ste 100
18191 Von Karman Ave
Irvine CA 92612
(949) 622-7210

Page 1 of 1

*1589021547490002*   22808

**Policies Paid by Your Insurance Service Account (ISA) Plus**   See reverse side for an Explanation of Terms

| Insured | Life Policy No. | Type of Policy | Quarterly Premium | Allocated Dividend | Total Payment |
|---|---|---|---|---|---|
| Christian L  Burke | 16-903-965 | Term 75 | $394.96 | $7.72 | $387.24 |
| Richard W  Gross | 16-903-721 | Term 75 | 456.71 | 15.44 | 441.27 |
| Patricia G  Jung | 16-950-555 | Term 75 | 176.25 | 1.29 | 174.96 |
| Dawn  Uli Burke | 16-956-961 | Term 75 | 65.61 | | 65.61 |
| Kurt  Wolfgang | 16-927-595 | Term 75 | 341.31 | 11.84 | 329.47 |
| | | Life Sub-Totals | $1,434.84  - | $36.29  = | $1,398.55 |

Sub-Total for Life Policies   $1,398.55

ISA Surplus as of June 8, 2011:  $1,429.21.
Currently earning interest of .02%.  Rates change weekly.

Quarterly Payment Due June 28   $1,398.55

 Detach here   **To pay online, please visit our Customer Service site https://customerservice.northwesternmutual.com.**  Detach here 

Exhibit #3

VELOCITY NETWORKS, INC.
MINUTES BOARD OF DIRECTOR'S MEETING
April 6, 2011
DRAFT

Exhibit A

## Use of Proceeds

| | | Amount | |
|---|---|---|---|
| **Operating Cash** | | | |
| 12 month Reserve | $ | 250,000.00 | $ 20,833.33 Monies to be used to backfill the $40K a month in deficit with the sale of the DC |
| | $ | 250,000.00 | |
| **Stock Buyback** | | | |
| Stock Buyback Deposit | $ | 350,000.00 | will free $26K per month in cash |
| | $ | 350,000.00 | |
| **Infrastructure Upgrades** | | | |
| New Sonus Platform | $ | 150,000.00 | Leasing - $150K - $5K month (if we can get an approval) |
| Other Network Upgrades | $ | 100,000.00 | Upgrade routers, switches, and firewalls in LA & DAL |
| Broadsoft | $ | 45,000.00 | New Licensing/ 2010/2011 Maintenance |
| | $ | 295,000.00 | |
| **Debt Pay down** | | | |
| KW Loan pay down | $ | 50,000.00 | Payback $50K of $395K on books - will free $500 per month in interest payments |
| RD Loan paydown | $ | 50,000.00 | Paydown $50K of $89K on books |
| GS Management | $ | 30,000.00 | Loan payback |
| CB Loan paydown | $ | 29,772.00 | CB Loan payback |
| Greenlake Cap | $ | 20,000.00 | Deferred Commissions |
| Aviso Corp | $ | 15,742.00 | Aviso Deferred Commissions |
| Greg Nielson Loan | $ | 5,000.00 | Payback of loan on IPT Books |
| | $ | 200,514.00 | |
| **Total** | $ | 1,095,514.00 | |

**VELOCITY NETWORKS, INC.**
**MINUTES BOARD OF DIRECTOR'S MEETING**
**April 6, 2011**
**DRAFT**

Exhibit B
Stock Buy Back Plan

| | | Amount of share: | Total Purchase Price | Price per share | |
|---|---|---|---|---|---|
| | | | | | This buyback represents a 30% increase in |
| Rich Gross | | | | | all shareholder positions and an annual |
| | | 2,410,000.00 | $ 400,000.00 | $ 0.17 | reduction in expense of $350K |
| Christian Burke | | 4,908,000.00 | $ 600,000.00 | $ 0.12 | |
| | Total Deal | 7,318,000.00 | $ 1,000,000.00 | $ 0.14 | |
| | | | | | |
| Deal Structure | | | | | |
| Initial Payment Rich Gross | | 1,054,375.00 | $ 175,000.00 | | |
| Initial Payment Christian Burke | | 1,054,375.00 | $ 175,000.00 | | |
| | | 2,108,750.00 | $ 350,000.00 | | |
| | | | | | |
| Second payment - Jan 2012 | | | | | |
| Rich Gross | | 602,500.00 | $ 100,000.00 | | |
| Christian Burke | | 602,500.00 | $ 100,000.00 | | |
| | | 1,205,000.00 | $ 200,000.00 | | |
| | | | | | |
| Third Payment - Jan 2013 | | | | | |
| Rich Gross | | 602,500.00 | $ 100,000.00 | | |
| Christian Burke | | 602,500.00 | $ 100,000.00 | | |
| | | 1,205,000.00 | $ 200,000.00 | | |
| | | | | | |
| Forth Payment - Jan 2014 | | | | | |
| Rich Gross | | 150,625.00 | $ 25,000.00 | | |
| Christian Burke | | 602,500.00 | $ 100,000.00 | | |
| | | 753,125.00 | $ 125,000.00 | | |
| | | | | | |
| Fifth Payment - Jan 2015 | | | | | |
| Christian Burke | | 818,000.00 | $ 100,000.00 | | |
| | | 818,000.00 | $ 100,000.00 | | |
| | | | | | |
| Fifth Payment - Jan 2016 | | | | | |
| Christian Burke | | 818,000.00 | $ 100,000.00 | | |
| | | 818,000.00 | $ 100,000.00 | | |

Additional Deal Points

Christian will be paid down the $30K owed to him on the balance sheet

The company will fund the life Insurance for both Christian & Rich until it is able to buy out there collateral on the company debt ($250 Mo)

The company will pay for the current insurance premiums (minus the HSA contribution) until It is able to buy out there collateral on the
  company debt ($1,000 mo)

The company will provide reasonable Internet/telephone and hosting services (contingent on Lunar Pages approval) to both as long
  as Christian and Rich are Shareholders.

$100K each payment annually from INO check until paid in full

Backup plan of $8K each per month if INO discontinues service

Both Christian and Rich will be under contract going forward on an hourly basis to insure we have access to there knowledge if needed.

Option for partners to keep remaining stock at each payment milestone

Liquidity event prior to buyout of stock would prioritize cash towards buyout.

Buyout agreement will be crafted by corporate council

Both will keep board seat until buyout complete, and secured debt paid off.

Buyout agreement will be approved by board of directors.

Exhibit #4

From: **Greg Nielsen** <greg@vel.net>
Date: Mon, Sep 19, 2011 at 8:18 PM
Subject: Notice of a telephonic special meeting of the board of directors of Velocity Networks,
Inc. ("Velocity") on Thursday September 22, 2011 at 1:30 PM PST
To: Sheri Berke <sherib@vel.net>, "sheri@vel.net" <sheri@vel.net>
Cc: Christian Burke <christian@vel.net>, "christian@ftmbrand.com"
<christian@ftmbrand.com>, "rwgesq@gmail.com" <rwgesq@gmail.com>, Richard Gross
<rich@vel.net>, "linda@vel.net" <linda@vel.net>, "ynot29cool@yahoo.com"
<ynot29cool@yahoo.com>, "greg@nielsenfamily.com" <greg@nielsenfamily.com>,
"roger.donaldson@gmail.com" <roger.donaldson@gmail.com>, Kurt Wolfgang <kurt@vel.net>


To: Sheri Berke, Secretary (sheri@vel.net, sherib@vel.net)

Cc: Kurt Wolfgang kurt@vel..net, Christian Burke
(christian@ftmbrand.com, christian@vel.net), Richard Gross
(rwgesq@gmail.com, rich@vel.net), Linda Gross (linda@vel.net, ynot29cool@yahoo.com),
Roger Donaldson (roger.donaldson@gmail.com)


From:  Greg Nielsen and Roger Donaldson


Dear Ms. Secretary,


Re:  Notice of a telephonic special meeting of the board of directors of

Velocity Networks, Inc. ("Velocity") on **Thursday September 22, 2011 at 1:30 PM PST**


In accord with the requirements of the Velocity bylaws for the calling of a special meeting of the
Velocity board requiring at least two directors, Greg Nielsen and Roger Donaldson, hereby give
this notice of a special meeting of the Velocity board on **Thursday September 22, 2011 at 1:30
PM PST**. At the meeting, we will consider a resolution authorizing the filing of the attached
complaint by the corporation in court.


To participate:

Conference Dial-in Number: (605)562-3000

Participant Access Code: 494196#

Attachments to this email:

Copy of lawsuit that IPT seeks to have the Velocity board authorize be filed and pursued

Copy of Christian Burke's stock redemption agreement (Exhibit "A" to the complaint)

Copy of Richard Gross's stock redemption agreement (Exhibit "B" to the complaint)

Copy of 4-6-2011 Velocity board resolutions and exhibits (Exhibit "C" to the complaint")

--
Greg Nielsen
512-275-4200
greg@nielsenfamily.com

Exhibit #5

## Declined: Special board meeting of the board of directors 1:30 PST

Kurt Wolfgang                           Sent: Tuesday, September 20, 2011 12:12 PM
**To:**      Greg Nielsen

**When:**     Thursday, September 22, 2011 3:30 PM-4:30 PM.
**Location:** Conf Call

**Accepted:** No attendees have accepted.
**Tentative:** No attendees marked their acceptance Tentative.
**Declined:** Kurt Wolfgang

Exhibit #6

**From:** brian pettersen <brianp@plasmetcorp.com>
**Date:** September 27, 2011 3:33:38 PM MDT
**To:** kurt@vel.net, christian@vel.net, linda@vel.net, rich@vel.net,
roger.donaldson@gmail.com, sheri@vel.net, sherib@vel.net,
greg@nielsenfamily.com
**Subject: Demand by IP Telesis, Inc. that the Board of Velocity Networks, Inc.
authorize a suit by that corporation**

September 27, 2011

To The Board of Directors of Velocity Networks, Inc.

From:  Brian Pettersen, Chairman, IP Telesis, Inc.

Subject: Demand by IP Telesis, Inc. that the Board of Velocity Networks, Inc. authorize a suit by
that corporation against Kurt Wolfgang, Christian Burke and Richard Gross and the DOE
defendants to vindicate its rights and recover its damages

Ladies and Gentlemen:

In a 9/19/2011 email to each of you from Greg Nielsen you were provided with a copy of the
complaint describing the underlying facts supporting causes of action of Velocity Networks, Inc.
against Kurt Wolfgang, Christian Burke and Richard Gross, and you were notified that the board
would be requested to authorize the corporation to bring the lawsuit against those three persons
and the DOE defendants at the telephonic special board meeting scheduled for September 22,
2011.  For lack of a quorum at the 9/22/2011 board meeting, another board meeting for that same
purpose has been scheduled and noticed for Thursday, September 29, 2011 at 5:00 p.m. P.S.T.

IP Telesis, Inc. is a shareholder of Velocity Networks, Inc., and was a shareholder during all
relevant times described in the complaint that was submitted to each of you by Mr. Nielsen on
9/19/2011.  This email constitutes a demand by IP Telesis, Inc. that the board of Velocity
Networks, Inc. take action at its upcoming telephonic special meeting to authorize the bringing

of a lawsuit against Kurt Wolfgang, Christian Burke and Richard Gross to vindicate the corporation's rights and to recover its damages and other remedies to which it is entitled arising from the facts as alleged in the complaint that was provided to each of you.


Very truly yours,


Brian Pettersen

Chairman, IP Telesis, Inc.

**From:** Kurt Wolfgang
**Sent:** Thursday, September 29, 2011 3:49 PM
**To:** Christian Burke; Greg Nielsen; Kurt Wolfgang; Linda Gross (linda@vel.net); 'Lyle Maul' (lylem@pacsan.com); Richard Gross; Roger Donaldson; sheri@vel.net
**Subject:** Velocity Board Meeting

Dear Board members,

As you know, Greg Nielsen and Roger Donaldson have called a Special Board Meeting. Because of the seriousness of the issues Greg wants to address, we should have as many board members attend as possible. At a minimum, we need to have a quorum. At least two board members are out of the country and one will not return until March 5th. We will schedule the meeting as soon as possible but it looks like the Board meeting will not happen until late next week or the following week. We will send notice of the meeting as soon as a date is selected.

In the meantime, I wanted to remind you about some of the details of the stock purchase that occurred recently. While we will discuss things in greater detail at the meeting, several years ago the company entered into agreements with me, Christian Burke and Richard Gross where we personally guaranteed certain company debt which currently totals approximately $2.2 million. As you remember, this was all done with full Board approval.. With the sale of the data center, we had an opportunity to eliminate approximately $400,000 in company debt and save about $400,000 in annual expenses including salaries for Christian Burke and Richard Gross. After consultation with our CPA and attorneys we structured the deal, received Board approval and finalized the transaction. Again, I will provide greater detail at the meeting.


**Kurt Wolfgang | CEO**
Velocity Networks, Inc.

5155 Rosecrans Ave, Suite 100, Hawthorne, CA 90250

Office: 310-263-4800 | Toll Free: 800-626-6515

Direct: 310-263-4811 | Fax: 310-263-4896

Email: kurt@vel.net   Web: http://www.vel.net

**Business Grade Voice & Data Solutions**

VoIP | Broadband | Co-location | Professional Services

- **Notice:** Please use "Reply to All" when responding to this email.
- For general support please call 800-404-5407 or email support@vel.net.

- For billing, sales or the general office please call 310-263-4800.

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you.

Exhibit #8

**From:** Lyle Maul <lylem@pacsan.com>
**Date:** September 30, 2011 2:20:03 PM MDT
**To:** "'brianp@plasmetcorp.com'" <brianp@plasmetcorp.com>
**Cc:** "'kurt@vel.net'" <kurt@vel.net>
**Subject: Offer to purchase Vel shares**

Brian
I have assembled a small group of buyers that are interested in purchasing the Velocity shares
owned by IP Telesis for a price similar to what Vel founders recently agreed to sell their shares
for - an avg price of $.14/share. Please let me know if u would like to receive a formal offer.
Lyle
Lyle Maul

Exhibit #9

# THE ZOHAR LAW FIRM

A PROFESSIONAL CORPORATION

601 S. FIGUEROA STREET, SUITE 2675
LOS ANGELES, CALIFORNIA 90017
(213) 689-1300
FAX (213) 689-1305

April 21, 2011

Kurt Wolfgang; kurt@vel.net
Sheri Berk; sheri@vel.net
Christian Burke; Christian@vel.net
Richard Gross; richard@vel.net
Linda Gross; linda@vel.net
Greg Nielsen; greg@vel.net
Roger Donaldson; roger.donaldson@oracle.com

**RE:    Inspection of Records of Velocity Networks, Inc.**

Dear Members of the Board:

This office represents IP Telesis, Inc. ("IPT"), a 17% shareholder of Velocity Networks, Inc. (the "Company), and seeks documents and information on its behalf, as well as by and through Greg Nielsen, who is IPT's appointed director of the Company.  As such, IPT, as a 17% shareholder, and Mr. Nielsen, as a director, are entitled, pursuant to the California Corporations Code, to inspect records and information about the Company, which will be discussed more fully below.

It is our understanding that the Company intends to close a deal for the sale of its data center, and that such closing is imminent.  However, to date, Mr. Nielsen, and presumably the other directors of the Company, have not been given full access to all of the documents and information necessary to properly assess the benefits or detriments of such a deal, as well as any potential conflicts of interest among the directors who approved the deal.  Upon such an inspection and review, it may very well turn out that the deal makes sense. However, such a determination can and should only be made after proper due diligence is undertaken and a careful, objective analysis is performed. After all, each of the Company's directors owe a fiduciary duty of care to the corporation and its shareholders, and must serve "in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." Cal. Corp.Code  § 309(a).

Velocity Networks, Inc. Board of Directors
Page 2
April 21, 2011

Given the immediacy of the pending asset sale, Mr. Nielsen and/or his designated agents or attorneys, plan to inspect and/or copy the documents and information listed below starting at 10 a.m. at the Company's main offices on Monday, April 25, 2011.  Please implement whatever arrangements are necessary to make available all of the categories of documents and records. To the extent any or all of the documents are kept in electronic form (ie. Quickbooks, Excel, etc.), production in those digital formats on a disk or thumbdrive will be acceptable.

Mr. Nielsen, as a director of the Company, has an *absolute* right to inspect corporate books, records and physical properties at any reasonable time. This includes the right to make copies or extracts of any such records or documents. Inspection may be demanded by any director individually and may be conducted in person or by an agent or attorney. [Cal. Corp. Code § 1602; see *Havlicek v. Coast-to-Coast Analytical Services, Inc.* (1995) 39 Cal. App. 4th 1844, 1851–1852.

Of course, it is my client's request and recommendation that any deal to sell the data center not be entered into or consummated before the completion of a thorough review of the relevant materials, and they would respectfully suggest that any sale of the Company's data center be postponed for 30-45 days to allow for such review. In the event such a temporary delay is allowed, my client would be open to delaying the inspection to allow for a more measured approach all around.

You are hereby requested to produce or make available for inspection and copying:

1) Copies of 2009 & 2010 US Corporate Income Tax Returns for the Company

2) The following 2009 and 2010 financial statements:
    a. Balance Sheet
    b. Statement of Operations (Profit or Loss)
    c. Statement of Cash Flows
    d. Statement of Shareholder Equity

3) 1st Quarter 2011 Financial Statements as of March 31, 2011
    a. Balance Sheet
    b. Statement of Operations (Profit or Loss)
    c. Statement of Cash Flows
    d. Statement of Shareholder Equity

4) The Company's check register for 2009, 2010 and 1st quarter of 2011.

5) All Company payroll reports and W-2s for 2009 and 2010

Velocity Networks, Inc. Board of Directors
Page 3
April 21, 2011

6) Current 1st Quarter 2011 Payroll Report used to complete Federal Form 941

7) All company credit card statements for 2009, 2010 and through March of 2011

8) All records and minutes of the shareholders, Board of Directors and committees of the corporation, including all resolutions, consents, etc

9) Copies of all employment agreements between the Company and its Board Members

10) Copies of all stock option agreements – restricted or non-restricted.

11) Current shareholder records, including a list of all names, addresses, and amounts of holdings.

12) A copy of the Articles of Incorporation and Bylaws of the Company, including any and all amendments, as well as copies of any shareholder agreements, along with any amendments and/or related documents.

Please confirm by the close of business tomorrow (Friday, April 22) that the books and records will be accessible at the designated time, or in the alternative, if the data center deal has been or will be postponed sufficiently to allow for a less urgent inspection schedule.

My client is deeply interested in ensuring the long –term success of the Company.  We look forward to moving forward in orderly fashion.

Thank you for your attention to this matter.

Very truly yours,

Daniel Y. Zohar, Esq.

**for ZOHAR LAW FIRM, P.C.**

DYZ/je
CC:   Greg Nielsen
         Dan Clark
         Brian Pettersen

<u>VERIFICATION</u>

I, Greg Nielsen, am the duly authorized agent for the plaintiff, IP Telesis, Inc.  I have read the foregoing First Amended Complaint to which this verification form is attached and know the contents thereof.  The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 21, 2012 at AUSTIN, Texas.

Greg Nielsen